## AULT v. DUSTIN.

*(Nashville.* February 28, 1898.)

1. CONTRACT. *For sale of rope construed.*

The purchaser of a quantity of rope, which is to be manufactured and delivered upon his orders, in assorted sizes, by a specified date, breaches his contract by failure to give orders a sufficient time before the date fixed for final delivery, to reasonably enable the seller to manufacture and deliver the goods. (*Post, pp. 373–380.*)

2. SAME. *No estoppel to insist upon breach of, when.*

That a party had insisted that his contract had been canceled will not estop him to defend a suit thereon upon the ground that the other party had breached the contract. The two contentions are not inconsistent, but the latter is included in the former. (*Post, pp. 376–380.*)

Cases cited: Ins. Co. v. Thornton, 97 Tenn.. 8; 96 U. S., 258; 15 Wend., 474; 8 N. Y., 113; 77 N. Y., 488.

3. SAME. *Right to violate, renounce or abandon.*

The legal right of a party, on general principles, to violate, abandon or renounce his contract on the usual terms of compensation to the other party for the damages which the law allows, is universally recognized. (*Post, p. 383.*)

Cases cited: Railroad v. Staub, 7 Lea, 405; 121 U. S., 264; 16 L. R. A., 655; 43 Am. Dec., 670; 19 Am. Rep., 283; 74 Am. Dec., 721; 37 Vt., 239; 115 Mass., 159.

4. SAME. *Anticipatory breach.*

The purchaser's renunciation, though made before the time of performance has arrived, puts an end, subject to the seller's claim for damages, to a contract for a quantity of rope to be manufactured and delivered, in assorted sizes, on the purchaser's orders by a specified date. (*Post, pp. 380–388.*)

Cases cited: 16 L. R. A., 655; 51 Minn., 499.

5. SAME. *Not revitalized, when.*

The purchaser's withdrawal, after the time for performance has arrived, of his renunciation of his contract, made before and continued until that date, although not assented to by the sel-

ler, does not operate to revitalize a contract for the manufacture and delivery of a large quantity of rope in assorted sizes by a certain date, especially where it appears that the seller has been prevented, by such renunciation, from taking necessary preliminary steps for due performance of his contract. (*Post, pp. 386–388.*)

FROM DAVIDSON.

Appeal from Chancery Court of Davidson County. H. H. Cook, Ch.

J. S. Pilcher for Ault.

George T. Hughes for Dustin.

McAlister, J. Complainants, who are wholesale merchants at Cincinnati, Ohio, filed this bill in the Chancery Court of Davidson County against the defendants, who are manufacturers of cotton clothesline and rope, at Lawrenceburg, Tenn., to recover damages for the breach of two contracts. A recovery is asked against the defendant, in the first instance, for the breach of a contract to deliver to complainants five thousand dozen cotton clotheslines, and, in the second, for a failure to deliver three thousand reels of cotton rope. The Chancellor found the contracts as alleged, and awarded damages for their breach. The Court of Chancery Appeals modified and affirmed the decree of the Chancellor. The result of this decree was a recovery in favor of complainants for $137 for breach of the clothesline contract, and $1,302.75 for breach of the contract

for reel rope. Defendants have appealed to this Court, and their assignments of error relate exclusively to the reel rope contract. The Court of Chancery Appeals found that the contract of the parties on the subject of the reel rope was embodied in the following correspondence, to wit:

Defendants wrote, viz.: "July 9, 1892. We would like very much to sell you the rope, but cannot sell you coil rope at your offer. Will take your order for 2,500 reels for 10 cents, 60 days, 2 per cent. off for cash."

Complainants replied: "July 13, 1892. We accept your offer of the ninth for the reel rope. You will therefore enter our order for 3,000 reels for $\frac{1}{4}$, $\frac{5}{16}$, $\frac{3}{8}$, and $\frac{1}{2}$ cotton rope at your price of 10 cents per pound. Deliver at all common points, as talked with your Mr. Dustin. Terms, 60 days, or 2 per cent. off for cash on receipt of goods. . . . Shipments to be made as ordered by us, and to commence in November, the whole amount, however, to be ordered out by March, 1893."

Defendants reply: "July 16, 1892. We enter order with thanks. As we will have to commence on the order soon, please let us have the assortment of sizes at once, and oblige."

In reply, two days later, complainants say: "July 18, 1892. Please ship us, as soon as convenient, 75 reels $\frac{1}{4}$ rope, 15 reels $\frac{5}{16}$, and 10 reels $\frac{3}{8}$, cotton rope." And again, on July 19, they ordered 5 reels of $\frac{1}{2}$ cotton rope.

"It will be observed," says the Court of Chancery Appeals, "that this [these orders] was a slight departure from the contract, inasmuch as under the contract, shipments were not to begin until November."

However, upon receiving these reels, the complainants wrote to defendants, with respect thereto, July 28, 1892, viz.: "Your first shipment of cotton rope on reels just to hand. Upon examination, we find you are putting in a 4-pound reel. This seems to us to be scandalous, as we have bought thousands and thousands of reels of rope, and never thought of putting in a reel that would weigh more than $2\frac{1}{2}$ pounds, which is fully as heavy as any firm in the country put in their rope. Please let us hear from you in regard to this."

On July 30, 1892, the defendants replied, viz.: "Your favor of twenty-eighth, complaining of the weight of our reels, to hand. In answer, we will say we have sold thousands on top of thousands of our reel rope in your city, and this is the first complaint. We are to-day shipping a firm in your city, whom we have sold for years, and we are yet to receive the first complaint, and they are paying us more money for the rope than you are. If you will take the trouble to weigh one of January & Woods' or Pierce, Atkins & Co.'s reels, you will find their reels as heavy, if not heavier, than ours, and the rope not as good as ours by twenty per cent. We are satisfied you will not have any trouble

16 P—24

with the trade with our reels. We do not use a reel any heavier than any firm in the country, in fact, not as heavy as the most of them,'' etc.

Complainants, on August 3, 1892, replied, viz.: ''Your favor of the thirtieth ult. to hand and noted. We still think that your reels are entirely too heavy, and they will cause us lots of trouble. If, however, our trade takes them all right, it will be satisfactory to us, but if they make complaint and claim reduction, we shall expect you to stand whatever loss you have caused on this account.''

Defendants, on August 4, 1892, replied, viz.: ''Your favor of the third to hand and noted. In answer will say that we cannot agree to same, for we cannot be responsible to you for what your trade may claim. All we can say is this, we are using the same weight reel we have used for years, and never had any trouble as to weight of same. Sold last season, in your city alone, 4,000 reels, and to-day we are having a better trade on our rope than we have had in years, at this season of the year, and all from a trade we have sold ten to fifteen years.''

Complainants replied, on September 22, 1892, viz.: '' We have not replied to your letter of August 4, regarding rope reels, because we have been waiting to see whether the heavy reels would be satisfactory or not. We find now that they will not suit us, and you will therefore please cancel our order of July 13.''

Defendants replied to this letter on same day, viz.:

"Your favor of twenty-second to hand, and in answer will say we cannot permit you to cancel the balance of your order for reel rope. We have your order, which plainly states to book for you so many reels, and we answered promptly we would do so. You are mistaken when you say you did not reply to our letter of August 4, for you did so, and we have it before us. Now, we know rope has declined since you placed your order with us; satisfied that you could buy for a little less money, but that does not affect our contract with you. If rope had advanced two cents, we would have expected to fill your order at contract price; but we are willing to do what is right. We don't only expect to sell you this lot of rope, but hope to be able to sell you the most of the rope you handle. You know we make as good if not better rope than is sold in your market. So let us hear from you at once."

Complainants replied on September 27, 1892, viz.: "Your favor dated 22d inst. to hand, and noted. We do not see how we can change our letter of 22d inst., and you will find that letter to be correct in every particular. If you will refer to our letter of July 28, you will see that we objected very seriously then to the weight of your reels, and stated then that they would not do us, and we find what we stated to you then is correct. You speak about rope having declined, etc. We wish to say to you right here that we always live up to our con-

tracts fully in every particular, and you 'will notice that rope had not declined at the time we made the kick on your weight of reels on July 28.''

Defendants replied to this letter September 29, 1892, viz.: ''Your favor of 27th to hand, and in answer will again say we cannot permit you to cancel your order for reel rope. We shall . expect you to take the rope as per your contract. We also wish to say right here that we have never yet failed to stand to our contracts regardless how cotton should go.''

No further correspondence between the parties occurred until November 28, 1892, when complainants wrote defendants directing them to ship immediately 75 reels of $\frac{1}{4}$ cotton rope and 25 reels $\frac{5}{16}$ cotton rope, and referred to the same as being in the order now in controversy in this case.

Defendants replied November 29, 1892, viz.: ''Your favor of the 28th with order for 100 reels of rope, to hand. Not having any order with us, having canceled same, we do not understand it.''

December 2, complainants replied: ''You appear to be somewhat peculiar people. We wish you would take your letter of November 29, and then take your letter of September 29, and tell us just what you mean. In your letter of September 29, you advise us that you positively will not cancel our order, and that you expect us to take the rope. You also stated that you never failed to live up to your contracts, regardless of how cotton should go

We have always understood that it takes two parties to make a contract, and likewise the same to cancel it. Is this your understanding? If you do not wish to fill the contract, how much will you pay us to cancel it?"

December 3 defendants answered: "Answering yours of the second, will say, you not having any order with us for reel rope, do not know what you mean by filling contract. But you stated that our reel was heavy; your trade would not have them, etc., and canceled the same."

No further communication passed until December 24, 1892, when on that day complainants wrote, viz.: "You will please ship us, immediately, 1,200 reels of cotton rope, assorted as follows: 500 reels of $\frac{1}{4}$ inch, 500 reels $\frac{5}{16}$ inch, 200 reels $\frac{3}{8}$ inch."

January 16, 1893, complainants wrote defendants, viz.: "Please ship us immediately, under our contract, 300 reels $\frac{1}{4}$ inch cotton rope, 500 reels $\frac{5}{16}$ inch cotton rope, 200 reels $\frac{3}{8}$ inch cotton rope."

Again on February 21, 1893, complainants wrote defendants, viz.: "Please ship us immediately, on our contract, 400 reels $\frac{1}{4}$ inch cotton rope, 300 reels $\frac{5}{16}$ inch cotton rope, 95 reels $\frac{3}{8}$ inch cotton rope."

The Court of Chancery Appeals finds that none of these orders were filled, and that all shipments made on the contract were 100 reels specified in the letter of July 18, 1892, and five reels specified in the letter of July 19, 1892.

A brief summary of this correspondence shows

that on July 13, 1892, these parties entered into a contract for the purchase and sale of 3,000 reels of rope. The shipments were to commence in November, and to be made as ordered by complainants, the whole amount to be shipped, or ordered out, by March, 1893. Defendants, at time of entering this order, requested complainants to send assortment of sizes at once, since they would have to commence the manufacture of the rope soon. On July 18, 1892, complainants, several months in advance of the time fixed for shipments to commence, ordered about 100 reels of a specified description. When this shipment was received, complainants protested against the four-pound reel used, claiming that it was scandalous, and that a reel weighing two and one-half pounds was customary, and in every respect ample. Defendants immediately replied, refusing to make a lighter reel. On September 22, thereafter, complainant notified defendant that the heavy reels were unsatisfactory, and closed · their letter by ordering a cancellation of their order for 3,000 reels of rope. Defendants replied, · saying, " We cannot permit you to cancel the balance of your order for reel rope," and charged that complainants were seeking, a cancellation for the reason that rope had declined in the market since complainants had placed their order. Complainants, in reply, stated that the price of reel rope had not declined when they first made complaint of the heavy reels on July 28. Defendants replied September 29, 1892, again de-

clining to permit complainants to cancel their said order for reel rope, and notifying them they were expected to take the rope as per their contract. The matter was then permitted to rest in abeyance until November 28, 1892, when complainants began to order shipments of rope in accordance with the terms of their original contract. Defendants refused to honor these orders upon the ground that complainants had canceled their said contract, and wrote them, viz.: "You stated that our reel was heavy, your trade would not have them, and then canceled your order." Complainants, however, continued to order shipments of rope, of the descriptions specified, until the whole amount of 3,000 reels were ordered, but, as already stated, defendants refused to fill any of said orders.

What, then, is the law governing this state of facts? The Court of Chancery Appeals found that "defendants refused to agree to the rescission, and their failure in any way to indicate, before the time of performance began, that they elected to treat the complainants' acts as a breach, left the contract in full force, and left to the complainants a *locus penitentiæ*, of which they availed themselves within the time fixed for performance—that is, on the twenty-eighth of November. . . . Complainants, recognizing that their effort to rescind had proven futile, by reason of the defendants' refusal to agree to it, began to perform the contract by ordering the goods" within the limits of time prescribed by

the contract. The Court of Chancery Appeals there-
upon awarded complainants damages against the de-
fendants for the latter's breach of said contract, for
the sum of $1,302.75 as already stated.

The first assignment of error made on behalf of
defendants, is "that complainants did not comply
with their part of the contract, by furnishing the
assortment of sizes for the manufacture of the goods
within the time contemplated by the . contract."
Upon this point the Court of Chancery Appeals say:
"There was nothing in the, contract upon the sub-
ject, except such inference as may be drawn from
the expression ' shipments to made as ordered by us.'
If any inference can be drawn at all," says that
Court, "it would be that specifications were to be
furnished with the orders, as they were in fact fur-
nished." It will be remembered that defendants, in
their letter of July 16, acknowledging complainants'
order for 3,000 reels of rope, state that they would
have to commence on this order soon, and request
complainants to furnish at once the assortment of
sizes. It is claimed that the defendants understood
that the specifications were to be furnished at once,
and that the goods were to be manufactured in ad-
vance of the time when orders were to be given
for their shipment. It is, therefore, insisted that as
complainants did not furnish directions for the man-
ufacture of the goods until they gave their order for
shipment, on November 28, of 75 reels, and on
December 24, for 1,200 reels, they have failed to

comply with their part of the contract and cannot recover. It will be remembered that this contract provides that the rope to be manufactured shall be of different sizes. The defendant could not, of course, know what sizes to manufacture until notified by complainants. The law will imply, as a term to this contract, that the specifications should be furnished within a reasonable time, in order to enable the defendant to comply with his contract by March, 1893, the time limited. 1 Beach on Contracts, sec. 133.

Complainants, however, insist defendants cannot be heard now to raise this objection, since their refusal to fill complainants' orders was expressly placed upon the ground that complainants had canceled their order, and had no contract with them, and that it was not suggested at that time that complainants had failed to comply with the contract in not furnishing specifications or assortments of sizes for the rope. Counsel cite, in support of this position, the rule, "that when a party gives a reason for his conduct and decision touching anything involved in a controversy, he is estopped, after litigation is begun, from changing his ground, and putting his conduct on another and different consideration." *Railway Co.* v. *McCarthy*, 96 U. S., 258, page 36, citing *Gould* v. *Banks*, 8 Wend., 562; *Holbrook* v. *Wright*, 24 Wend., 474; *Everett* v. *Sutton*, 15 Wend., 474; *Wright* v. *Reed*, 3 T. R., 554; *Duffy* v. *O'Donovan*, 46 N. Y., 223; *Winton* v. *Coit*, 7 N. Y., 288.

The case of *Railway Co.* v. *McCarthy*, 96 U. S.,
was an action against the railroad to recover damages
alleged to have been sustained by complainant in.
consequence of the negligence, carelessness, and delay
on the part of the defendant in executing a certain
contract for the shipment of live stock. The Court
said, viz.: "The question made by the company upon
the Sunday law of the State of West Virginia does
not, in our view, arise in this case. We have al-
ready shown that the defendant proved, upon the
trial, that it was impossible to forward the cattle on
Sunday for want of cars. And it is fairly to be
presumed that no other reason was given for the
refusal at that time. It does not appear that any-
thing was then said as to the illegality of such a
shipment on the Sabbath. This point was an after-
thought, suggested by the pressure and exigencies of
the case."

In *Everett* v. *Satters*, 15 Wend., it was said that
"a party who, being called upon to account for goods
which have come to his hands, sets up title in him-
self independent of the lien, cannot afterwards, when
an action is brought against him, defeat a recovery
by setting up at the trial a right to detain the goods
on account of the lien. In suits on policies of
insurance the rule is enforced that a refusal to pay
on any other ground, or a denial of liability without
giving reasons, waives the furnishing of proofs, or
defects in them if they have been furnished." 2 May
on Ins. (3d Ed.), Sec. 469; *Insurance Co.* v. *Thornton,*

13 Pickle, 8; *Prentice* v. *Insurance Co.*, 77 N. Y.,
488; *Brink* v. *Hanner Fire Ins. Co.*, 8 N. Y., 113.
In all these cases it will be observed that the denial
of liability was, in the first instance, placed upon
some specific ground, which was wholly inconsistent
with that afterwards assigned.

We are of opinion the Court of Chancery Ap-
peals made an erroneous application of this principle
in the present instance. We fail to perceive wherein
the claim that complainants had failed to furnish
specifications for the manufacture of the rope is in-
consistent with the claim originally made that com-
plainants had canceled their contract. If defendants
had declined to comply with original contract, and
refused to make shipments, for the reason that com-
plainant had breached any specific stipulation in the
contract, we can see some reason why defendants
should not be permitted, on the trial, to rely upon
some other and different breach. In this case, how-
ever, defendants did not refuse to make shipments
on account of any specific breach of the contract by
complainants, but upon the broad ground that com-
plainants had canceled and repudiated the entire con-
tract, which was equivalent to a charge that they had
breached all the stipulations of the contract. De-
fendants did not thereafter assume an inconsistent
position when they claimed, on the hearing, as a rea-
son for not complying with the last orders of com-
plainants, that the latter had not furnished specifica-
tions in a reasonable time for the rope to ·be

manufactured of the assorted sizes. The failure to furnish specifications was evidence of abandonment of the contract by complainants, and was a reason why defendants should not be expected to comply with the contract when complainants sought to revive it. Complainants well knew that this quantity of rope could not be manufactured within the limits of the contract, without prompt specifications for assortment of sizes. We are therefore of the opinion that the cases cited are wholly inapplicable in the present instance.

The next assignment is that the Court erred in holding that the notice of complainants to cancel the contract, and continued without retraction to November 28, was not a breach of the contract, and that the refusal of defendants to rescind held the contract open for performance by complainants.

Prof. Keener, in his Selections on Contracts, Vol. II., page 924, says: "If before the time appointed for performing the contract has arrived, the promisor refuses to perform it, but the promisee refuses to treat such refusal as a breach, and continues to insist upon a performance of the contract, he is precluded from afterwards treating such refusal as a breach."

Again, he says: "A refusal to perform a contract, made by a party at any time before the performance on his part is due, if not treated by the other party as a breach of the contract, is, in effect, merely an expression of an intention to break

the contract, and may be retracted; until retracted, it is evidence of a continued refusal down to and inclusive of the time appointed for performance. After such refusal has been treated as a breach of the contract by the promisee, it is no longer competent for the promisor to withdraw his refusal and offer to perform the contract, although the time appointed for actual performance may not have arrived. The promisee has not a right, before the time for performance has arrived, to demand and have a distinct answer whether the promisor will perform the contract or not.''

In the case of *Johnstone* v. *Milling*, L. R., 16 Q. B. D., 460–467, Lord Esher, in reviewing the cases on this subject, said, viz.: ''I think that in all of them the effect of the language used with regard to the doctrine of anticipatory breach of contract is that a renunciation of a contract, or, in other words, a total refusal to perform it by one party, before the time for performance arrives, does not, by itself, amount to a breach of contract, 'but may be so acted upon and adopted by the other party as a rescission of the contract as to give an immediate right of action.' When one party assumes to renounce the contract—that is, by anticipation refuses to perform it — he thereby, so far as he is concerned, declares his intention then and there to rescind the contract. Such a renunciation does not, of course, amount to a rescission of the contract, because one party to a contract cannot by himself

rescind it, but by wrongfully making such a renun-ciation of the contract, he entitles the other party, if he pleases, to agree to the contract being put an end to, subject to the retention by him of his right to bring an action in respect of such wrongful rescission. The other party may adopt such renun-ciation of the contract, by so acting upon it as in effect to declare that he, too, treats the contract as at an end, except for the purpose of bringing an action upon it for the damages sustained by him in consequence of such renunciation. He cannot, how-ever, himself proceed with the contract on the foot-ing that it still exists for other purposes, and also treat such renunciation as an immediate breach. If he adopts the renunciation, the contract is at an end, except for the purposes of the action for such wrongful renunciation. If he does not wish to do so, he must wait for the arrival of the time when, in the ordinary course, a cause of action on the contract would arise. He must elect which course he will pursue.'' 1 Beach on Contracts, Secs. 409, 411, 412.

It is insisted, however, on behalf of defendants, that this was not a sale of goods *in esse*, but a contract to manufacture goods; that after a person ordering goods has given the manufacturer notice not to proceed with his work, the party so notified has no right to proceed with the manufacture. '' The principle is universal that while a contract is ex-ecutory a party has the power to stop performance

on the other side by an explicit direction to that effect, subjecting himself to such damages as will be compensation to the other party for being stopped in the performance of his work. The party thus forbidden cannot afterwards go on and thereby increase the damages, and then recover such damages. . . The legal right of a party, on general principles, to violate, abandon, or renounce his contract, on the usual terms of compensation to the other party for damages which the law allows, is universally recognized." 2 Beach on Contracts, Sec. 1716; Bishop on Contracts, Sec. 837; 1 Sutherland on Damages, 113; *Hickley* v. *Pittsburgh Steel Co.*, 121 U. S., 264; *Gibbons* v. *Bente*, 51 Minn., 499; *Davis* v. *Bronson*, 50 N. W. R., 836 (S. C., 16 L. R. A., 655); *Clark* v. *Marsiglia*, 43 Am. Dec., 670; *Howard* v. *Daly*, 19 Am. Rep., 283 (S. C., 61 N. Y., —); *Hosmer* v. *Wilson*, 74 Am. Dec., 721; *Danforth* v. *Walker*, 37 Vt., 239; *Collins* v. *Delaparte*, 115 Mass., 159; 2 Sutherland on Damages, 193, 526; *Railroad* v. *Staub*, 7 Lea, 405.

In the case of *Davis* v. *Bronson*, 50 N. W. Rep., 836 (S. C., 16 L. R. A., 655), it appeared that the defendant, having refused to perform a contract for the erection of a creamery by plaintiffs before they had entered upon the performance thereof, held that an action to recover the contract price would not lie, although plaintiff had, notwithstanding defendant's refusal to perform, completed the creamery according to contract. Plaintiffs had no right to go

on with the contract under such circumstances, and recover the contract price, their only remedy being for damages for breach of contract.'' In that case it will be observed that the refusal to perform was not premature. The contract specified no time when performance thereof should be entered upon by the plaintiffs, but it provided that the building, with all its equipments, must be furnished within one hundred days after the amount had been subscribed. It was the right of the appellant to notify them immediately of his determination not to carry out his part of the contract, in order to save himself from the increased damage which a partial performance before notice might cause.

The Court then proceeds to lay down the following important principle, to wit: ''It may well be true that where the performance by the party notified not to perform consists of a single act, as the tender of a deed, notice before the time for such delivery will not warrant an action for damages; but where the final act of tender is the culmination of other acts, which, in the nature of the case, must precede it, as where the party is to manufacture or build the thing to be delivered, then it is quite clear that the conduct which, before the time of delivery, prevents the taking of the preliminary steps—the manufacture of the article or the erection of the building—as effectually prevents, before the day of tender arrives, the possibility of delivery, as though that day had in fact arrived, and a tender of the

Ault *v.* Dustin.

thing had been rejected. In such a case the contract is as effectually broken by the notice not to go on with it, given before the day of delivery arrives—the person who is to do the work having then the right to enter upon the performance of same—as though the notice had been given on the very day of delivery. The question in all cases is, whether one party has prevented performance by the other party at the time when performance by him is due. This can be done as well by preventing the taking of these preliminary steps without which the first step cannot be taken, as by preventing the taking of such final step itself. These preliminary steps must often precede by many days the time of performance, and it therefore must follow that notice of refusal to carry out the contract in such a case, given before the time of performance, will operate as a breach of the contract, in case the time has arrived at which the person willing to keep the contract may enter upon the work under the contract." This case is approved in *Gibbons* v. *Bente*, 51 Minn., 499.

A breach of the contract takes place when the promisee disables the promisor from performing. Thus, where the promisor agrees to saw a certain number of feet of lumber, according to specifications, to be furnished by the promisee, the failure to furnish the specifications is a breach warranting the promisor in abandoning the contract and enabling

16 P—25

him to recover *pro tanto.* 1 Beach on Contracts, Sec. 405.

This Court is of opinion that the principles laid down in the cases last cited are applicable to the facts of the present case. The fundamental error, as we conceive, in the opinion of the Court of Chancery Appeals, is in ignoring the fact that the rope in question had to be manufactured, and that as early as July 16, 1892, when Dustin & Co. entered complainants' order for three thousand reels of rope, the latter were notified that defendants would "have to commence on the order soon," and complainants were requested "to send assortments of sizes at once." Complainants failed to do this except as to one hundred reels which they wished to use as samples, and when this sample shipment was received the complainants commenced a controversy in respect of the size of the reels used. Defendants protested that the four-pound reel used was customary, and in compliance with the contract. Complainants insisted it was too heavy, and that a two-pound reel was sufficient. Finally, on the twenty-second of September, complainants notified defendants to cancel their order of July 13. Defendants replied: "We cannot permit you to cancel balance of your order." September 28 complainants again wrote, refusing to withdraw their previous order of cancellation. September 29 defendants replied, again declining to cancel order, and notifying complainants that they were expected to take the rope as per

contract.    Defendants heard nothing more from com-
plainants until the twenty-eighth of November — a
lapse of two months—when they commenced .to order
immediate shipments of the rope, and from that
time on the orders came rapidly for immediate ship-
ments in accordance with specifications of sizes, which
were given for the first time in these orders.    Com-
plainants must have known that it would be impos-
sible for the defendants to fill these orders for
immediate shipment on account of their own failure
to send on specifications.

The contract in this case was for the manufac-
ture of rope of. different sizes, and, since delivery
was to commence in November, it was within the
contemplation of both parties that the specifications
should be furnished in advance of that time.    It is
shown that the manufacture of 3,000 reels of rope,
estimating thirty pounds to the reel, by a mill with
a daily capacity of 800 pounds, would require nearly
four months.    It will be observed that complainants'
order of November 28 was only for seventy-five
reels, and the next order for 1,200 reels was not
given until December 24.    Only a little over two
months was left within which to manufacture the
rope.    It was not contemplated that defendants
should be required to abandon all other work upon
which they might be engaged and give exclusive
precedence to the orders of complainant.    We are
constrained to believe that complainants, by failing
to retract their order of cancellation until it was

too late for defendants to manufacture the rope, have thereby prevented the performance of the contract, and that complainants are not entitled to the technical advantages which they are seeking to reap from their supposed retraction. Moreover, if complainants' letter of November 28 be accepted as a retraction of the order to cancel, there was still no withdrawal of their demand in reference to the weight of the reel. That matter was still left unadjusted, and defendants had no assurance that the four-pound reel would be satisfactory to complainants or that reclamation would not be made on account of its alleged excessive weight.

It is true that defendants refused to agree to a rescission, and notified complainants they would insist on a performance of the contract. But since defendants could not prevent a rescission of the contract by complainants, and could not compel a specific performance, their position simply amounted to a notification that they did not consent to a rescission of the contract, and would hold complainants liable in damages for the breach.

The decree of the Court of Chancery Appeals is reversed, and complainants' bill is dismissed so far as it seeks relief for the alleged breach of the reel rope contract. The costs will be divided.