CANTON COTTON MILLS *v.* BOWMAN OVERALL CO.*

(*Knoxville.* September Term, 1923.)

1. **CONTRACTS. Either party may withdraw until both are bound.**
Until both parties are bound either may withdraw. (*Post, p.* 27.)

2. **SALES. Seller withholding assent to order with respect to credit terms justified buyer in cancelling order.**
So long as the seller withheld his definite assent as to that part of the contract having to do with the credit terms thereof, which was a vital subject-matter between the parties, the buyer reserved the right of cancellation of the order. (*Post, p.* 27.)

3. **SALES. Clause in proposed contract held not to reserve to seller the right to hold open proposal of buyer pending investigation of finances.**
While a clause in a contract, "If, during the life of this contract, the financial responsibility of the purchaser becomes impaired, or unsatisfactory" to the seller, or "if bills are not paid promptly, the terms may be changed to cash terms and deliveries held up at the option of" the sellers '(until satisfactory adjustment is made, without impairing the validity of the contract," entitled the seller, after closing the contract, to all reasonable information from the buyer as to his financial *status*, and justified him, upon any appearance of impairment of the buyer's resources subsequent to the making of the contract, to change the terms to cash; the clause assumed a contract already in effect made under financial conditions at the time satisfactory to the seller, and did not apply to acceptance of the order so as to confer upon seller a reservation of a right to hold open the proposal of the buyer pending an investigation of his financial condition. (*Post, pp.* 27, 28.)

*On rule that when terms of agreement have been intended in a different sense, that sense is to prevail, against either party, in which he had reason to suppose the other party understood it, see note in 8 L. R. A. (N. S.) 1140.

Canton Cotton Mills v. Overall Co.

4. **CONTRACTS.** Interpretation parties give ambiguous contract controls.

The rule of practical construction is that the interpretation given by the parties themselves to an ambiguous contract as shown by their acts will be adopted by the court, and to that end not only their acts but their declarations may be considered. (*Post, pp.* 28, 29.)

Cases cited and approved: Chicago v. Shelton, 9 Wall., 50; Yowell v. Life Ins. Co., 141 Tenn., 70.

Case cited and distinguished: State v. Board of Trust, 129 Tenn., 279.

5. **CONTRACTS.** Acceptance must be identical with offer, and unconditional, to be effectual.

In order to make an acceptance effectual there must be no variance between it and the offer, and hence a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to negotiations unless the party who made the original offer renews it, or assents to the modifications suggested. (*Post, pp.* 29, 30.)

6. **SALES.** Facts held to show seller's acceptance was qualified with respect to credit terms, so that buyer was justified in canceling order.

Facts *held* to show that an exchange between the buyer and seller of informal contracts made up of fragmentary parts of various memoranda, telegraphic and oral communications did not in fact result in a consummation of the contracts, but that seller's subsequent letter accompanying a formal acceptance, as construed by him, suspended assent to the proposed contract in so far as it purported to provide for seventy days' credit term, until further investigation should be made, it appearing the question of credit was a vital one to both parties; so that the reservation and conditional acceptance of the seller left to the buyer the right to cancel his order, certainly, if he acted before definite action by the seller, which was done. (*Post, pp.* 30, 31.)

7. **ESTOPPEL.** Rule estopping party from changing original defense does not require detailed explanation of all defenses.

Rule that a party, having given a reason for his conduct about a matter in controversy, is estopped, after litigation is begun, from changing his ground, does not require detailed explanations of the grounds of defense. (*Post, pp.* 31-34.)

8. **ESTOPPEL.** Buyer canceling order for seller's refusal to reduce prices held not estopped from pleading nonconsummation of contract.

Where a buyer canceled an order with the seller when the latter refused to make further concessions in prices, the buyer, in an action against him for breach, *held* not estopped from interposing defense that the contract sued on was not finally consummated. (*Post, pp.* 31-34)

Cases cited and approved: Real Estate Co. v. Kyoleum Co., 142 Tenn., 295; Snyder v. Mystic Circle, 122 Tenn., 250; Taylor-Baldwin Co. v. Northwestern T. & M. Ins. Co., 18 N. D., 343; Hughes Bros. v. Aetna Ins. Co., 255 S. W., 363.

Cases cited and distinguished: Ault v. Dustin, 100 Tenn., 366; Bates v. Cashman, 230 Mass. 167.

---

### FROM KNOX.

---

Appeal from the Chancery Court of Knox County.—HON. HAL H. HAYNES, sitting by Interchange with CHAS. HAYS BROWN, Judge.

CHAS. M. ROBERTS, H. M. STEPHENS, J. HARRY PRICE and CATES, SMITH, TATE & LONG, for Cotton Mills.

FOWLER & FOWLER, for Overall Co. & Little Bros. Co.

MR. JUSTICE CHAMBLISS delivered the opinion of the Court.

These suits were brought to recover damages for breach of alleged contracts for the sale of cloth goods for future delivery, the defendants having refused to receive the goods, their defenses being, in substance: (1) That the alleged contracts were never bindingly completed; (2) that they were not with complainant Canton Cotton Mills, the manufacturer, but with the Farish Company, not as agents of the complainant, but as principal; and (3) that they were breached by the complainant in that it failed to ship and tender to defendants the quantity or quality of goods called for.

The chancellor decreed in favor of the defendants, holding that no contract had been consummated between the parties. This defense will be first considered, since, if sound, it is determinative.

The cloth article known as denim is manufactured by complainant Canton Cotton Mills, located in Canton, Ga., and is used by defendants, located in Knoxville, Tenn., in the manufacture of overalls. The product of the Canton Mills is handled by the Farish Company, commission merchants, located in New York City, and having in Knoxville a traveling agent, R. E. Gettys. This was the situation of the parties in December, 1918, and the early months of 1919, when the transactions which are the subject of this litigation took place. In previous years defendants had purchased and used in their business of making overalls the product of the Canton Mills, dealing with the same agencies, it being the custom of the defendants to contract in the winter months for their spring supply, these future delivery contracts, at prices fixed in advance, being essential to the prudent conduct of the business of all

parties, affording a firm basis for their purchases of raw product and sales of finished goods.

It seems to be conceded that the facts developed by the proof are to such an extent identical in their application to both the defendants as that the result in either case would control the other, and we shall therefore, for convenience in statement, use mainly the dealings with Little Bros. Company.

On December 19th, pursuant to authority from Canton Mills, the Farish Company wired Gettys at Knoxville to offer Canton 2.20 denims at 35 cents and 2.40 denims at 32½ cents, for weekly deliveries, beginning the first week in March and running through June. On the morning of the 20th Mr. Gettys showed this telegram, which covered certain other details not now necessary to mention, to Mr. Little, representing the defendant, who indicated a desire to contract for as much as two hundred bales of each of the numbers, and thereupon Gettys wired Farish to this effect. On the following morning, December 21st, Farish wired Gettys instructing him to confirm the sale to Little of two hundred bales of each of the numbers. On the same morning, before the receipt of the telegram of confirmation from Farish, Gettys had written and mailed to Little a letter reading as follows:

"Enclosed please find memo. of the nice order you gave me for Canton denims. This was wired to the Farish Company and just as soon as they advise me disposition of it I shall be glad to send you final confirmation."

It appears that upon receipt of the telegram from the Farish Company Gettys telephoned notice of this acceptance to defendant Little Bros. Company, and notation

thereof was duly made.  It is insisted for the complainant
that this interchange of communications definitely closed
the contract and bound complainant to sell and defendant
to buy the denims in the amounts and at the prices and for
delivery at the times specified, all essential elements of a
binding contract being thus sufficiently embraced.  Some
proof and argument is directed to the insistence that de-
fendants were to more or less extent misled, or overin-
duced, but this insistence is neither sustained by the proof,
nor is it a material issue under the pleadings.  It is quite
evident that the defendants purposed to procure definite
assurances that they would secure at the times specified
the supply of denim stipulated for and at prices at least
no greater than those named.  As before indicated, in ac-
cordance with the custom and reasonable requirements
of the trade, it was essential that the manufacturer of
overalls should know in advance of the making of its
sales of the finished product just what could be relied upon
as to quantities, deliveries, and prices.

Now, nothing more appearing, it would seem that the
wire of confirmation of December 21st from the Farish
Company, and its communication through Gettys to the
defendant, would have closed a contract.  However, it is
insisted on behalf of the defendants that this was not the
construction at the time placed upon these communica-
tions by the Farish Company, agents of complainant, but
that the further dealings on the part of the Farish Com-
pany clearly indicate a purpose to treat these communica-
tions as in effect negotiations only, and that complainant
is now bound by this construction given by its agents at
the time.  This insistence is based upon the following

additional facts: On the 2d day of January the Farish Company mailed to the defendants a formal memorandum of acceptance, reading as follows:

"We are pleased to inform you of the acceptance by Canton Cotton Mills of your valued order of the 20th ulto., for the following:

"200 bales Canton 2.20 denims at 35¢; 200 bales Canton 2.40 denims at 32½¢.

"Shipment equal weekly shipments March 1st to July 1st, 1919. Buyer agrees to accept up to 25% seconds of 2.20's and 15% of 2.40's if mill can't supply first at 1¼¢ less.

"We thank you for the business and solicit a continuance of your favors."

There follows a provision covering strikes and other contingencies and the signature of Farish Company. By the same mail, and according to the weight of the evidence, in the same envelope, the Farish Company sent the defendants the following letter:

"Your order of the 20th ult. for 200 bales Canton denims, approximate value $151,750, has come to the writer for his attention.

"We are accepting this order with the understanding that it will be subject to a line of credit which will be hereafter assigned to your firm. This line of credit, of course, will be determined largely by the showing made in your latest financial statement, which we presume will be as of the 1st inst., and this being the case, are writing to request that you favor us with a copy of this financial statement as soon as it is ready.

"Thanking you in anticipation of an early reply, we are."

It will be observed that, while the sums involved were large, the terms of payment, whether for cash or on credit and if on credit for what length of time, are in no way mentioned in the memorandum letter of formal acceptance, quoted above, nor in the letter referring to a line of credit, also quoted. Nor does it appear that this important feature of the contract was referred to in the wire communications between the Farish Company and Gettys of December 19, 20, and 21. However, an examination of the memorandum order dated December 20th and delivered by Gettys to Little, covers this detail, and sets out the terms as "2/10/60," which means a credit of as much as seventy days with two per cent. off, at the option of the buyer. In this connection it appears from the testimony of Mr. Little that, if deliveries had been made pursuant to the order given and upon the terms stated, approximately $80,000 of indebtedness would have accrued from Little Bros. Company before default, and that prior to this transaction the extent of indebtedness so accruing had never exceeded $35,000. It thus became apparent that the element of credit was of serious importance, warranting the consideration which was evidently being given this matter by the Farish Company.

Following receipt of these communications of January 2d Little Bros. Company, on January 9th, transmitted to the Farish Company a copy of its financial statement of September 30, 1918, stating that this represented conditions existing at the close of its fiscal year, "which we trust you will find satisfactory." On January 18th receipt of this statement was acknowledged by the Farish Company, saying that "The writer has not as yet had an oppor-

tunity to give your statement an analysis, but wishes to assure you that he will do so within the next few days and advise you regarding same."

Meanwhile defendants, beginning with January 7th, entered into correspondence with Farish Company regarding prices, requesting reductions in line with figures elsewhere obtained. This correspondence touching prices, which it is unnecessary to detail, continued until, in response to a letter declining to make any further concessions in the matter of prices, Little Bros. Company telegraphed the Farish Company on February 20th, "Cancel all orders booked for us. Letter follows." Much discussion is had in argument, *pro* and *con*, as to the phraseology of various portions of this correspondence, but the material substance is as stated. When the telegram of cancellation from defendant was sent on the 20th of February no advice had been received by Little Bros. Company from the Farish Company in accordance with the assurance given in the letter of January 18th, from which we have above quoted, with respect to the line of credit to be assigned.

Under these conditions it is insisted for the defendants in substance, that the action of the Farish Company in accepting these orders with the understanding that they would be subject to a line of credit to be thereafter assigned was a coupling of a condition with the acceptance, which was in legal effect a rejection by the Farish Company of the offers contained in the preceding communications, the memorandum order of December 20th having definitely provided for credit terms of as much as seventy days; that the defendants were thereby released, and that,

pending the decision by the Farish Company, the right to make which it had reserved to itself, as to the granting of credit, the right of cancellation was reserved to the defendants.

Although recognizing as we do the propriety of enforcing rigorously the performance of contracts for future deliveries under conditions such as are here presented, which make such contracts necessary to successful operation, despite the hardships which sometimes follow to either one or the other of the parties, and the lack of formalities and nonessential details, we are constrained to concede the plausibility of the contention thus made on behalf of the defendants in this case. It is an elementary principle that until both parties are bound either may withdraw, and it is difficult to escape the conclusion that, so long as the seller withheld his definite assent to an element of the contract so vital as the matter of credit appears to have been in this case, the buyers had reserved to them the right of cancellation.

Learned counsel for the complainant earnestly and ably urge, first, that the telegraphic communications of December 19th to 21st, inclusive, ten days prior to the sending out by the Farish Company of its letters dated January 2d, when taken in connection with the memorandum order of December 20th, so consummated and closed the contracts as to definitely bind all parties, and that therefore the later attempt, if it may be so construed, of the Farish Company to attach a material condition was unwarranted and ineffective, and should therefore be disregarded. And they further insist that these communications of January 2d from the Farish Company may

properly be accounted for and justified by a clause appearing on the back of the order, and therefore a part of the contract between the parties, which expressly reserved to the seller the right to readjust the credit terms of the sales.    Unfortunately, the language of this provision is so limited as to make it unavailing.    It reads as follows:

"If, during the life of this contract, the financial responsibility of the purchaser becomes impaired, or unsatisfactory, to the Farish Company, or if bills are not paid promptly, the terms may be changed to cash terms and deliveries held up at the option of the Farish Company until satisfactory adjustment is made, without impairing the validity of the contract."

It is quite obvious that this language is so restricted as to limit its effect to conditions possible to arise after the making of the contract, pending its performance, and it cannot reasonably be construed to have application to the acceptance of the order in such a sense as to confer upon the seller a reservation of a right to hold open the proposal of the buyer pending an investigation of his then financial condition.    Under this clause the seller was clearly entitled, after closing the contract, to all reasonable information from the buyer as to his financial *status*, and would have been justified upon any appearance of impairment of the buyer's resources subsequent to the making of the contract, in changing the terms to cash; but this clause assumes a contract already in effect, made under financial conditions at the time satisfactory to the seller.    If the request for a financial statement had followed an unconditional acceptance of the order, instead of accompanying it coupled with an express condi-

Canton Cotton Mills v. Overall Co.

tion as to its acceptance, such a request would have been wholly unobjectionable and justified by the provisions of the clause above quoted. The insistence first above noted, that the contract had been bindingly entered into and finally consummated before the communications of January 2d, has warranted and received careful consideration, but it is met by facts and a rule of law applicable which seem to us conclusive. The rule of "practical construction" is one now widely recognized, and is thus well stated:

"The interpretation given by the parties themselves to the contract as shown by their acts will be adopted by the court, and to this end not only the acts, but the declarations of the parties may be considered." 8 Williston on Contracts, par. 623, citing many authorities, including *State* v. *Board of Trust*, 129 Tenn., 279, 329, 164 S. W., 1151.

See, also, *Chicago* v. *Sheldon*, 9 Wall., 50, 19 L. Ed., 594; *Yowell* v. *Life Ins. Co.*, 141 Tenn., 70, 90, 206 S. W., 334.

This rule may properly be extended to the construction of the facts here appearing in determining what effect shall be given to the memoranda and communications bearing upon the making of these contracts. We have already intimated our recognition of the plausibility of the contention that these memoranda and communications of December 19th to 21st, inclusive, taken together, constituted contracts. But we are met with what plainly appears to have been a different construction placed by both parties on these transactions, evidenced, first by the seller's communications of January 2d, recognizing that

the terms of payment remained undetermined; and, second, by the correspondence thereupon opened by the buyers and thereafter conducted between the parties discussing prices. Both parties thus apparently treated the contracts as not finally closed, While it is recognized that the rule of practical construction has no application where the language of the contract is unambiguous and susceptible of but one construction, informal contracts such as these, made up of fragmentary parts of various memoranda, telegraphic and oral communications, invite the application of the rule, and, if at all ambiguous, will be governed by it.

The frank testimony of Mr. Farish sustains the view that the buyer did not regard the contracts as finally closed. Referring to the letter of January 2d, expressly reserving the question of credits, he states that his final acceptance of the order was dependent on what might be thereafter ascertained to be the financial condition of the defendants, and that this letter of January 2d, accompanying the formal acceptance, was sent "as a part of the contract," and he construes this letter as reserving the right to refuse shipments absolutely unless paid for in cash. The manifest effect, therefore, as construed and intended by the seller, was to suspend assent to the proposed contract, in so far as it purported to provide for seventy days' credit terms, until further investigation could be made. The facts of this case show this to have been a most material matter, it appearing, indeed, that the buyers were not in financial condition to meet cash terms, if the seller had finally concluded to demand cash. It follows that this reservation and conditional acceptance

on the part of the seller left to the buyer the right to cancel his order, certainly, if he acted before definite action by the seller, and this is what was done.

The controlling rule of law is elementary, but it is well stated in 13 Corpus Juris, 281, as follows:

"An acceptance, to be effectual, must be identical with the offer and unconditional. Where a person offers to do a definite thing, and another accepts conditionally or introduces a new term into the acceptance, his answer is either a mere expression of willingness to treat, or it is a counter proposal, and in neither case is there an agreement."

Again in 6 R. C. L., 608, it is said: "In order that there may be a meeting of the minds which is essential to the formation of a contract, the acceptance of the offer must be substantially as made. There must be no variance between the acceptance and the offer. Accordingly a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation unless the party who made the original offer renews it, or assents to the modifications suggested."

And to the same effect is 1 Williston on Contracts, p. 57.

These text-book statements of the rule are well supported by the authorities cited, and, applying this rule to the facts of this case, it must be held that the contracts sued on were not finally consummated.

But it is insisted that this defense of uncompleted contract should not be entertained because it is offered in violation of the rule of law which estops a party who has assigned reasons for his breach of a contract before

suit is brought from thereafter assigning and asserting other grounds of defense. Authorities are cited for this insistence, but such authorities as go to the extent of confining defenses to those grounds or matters that had been mentioned or discussed between the parties previous to the institution of the suit are not approved. The rule that a party, having given a reason for his conduct about a matter in controversy, is estopped, after litigation is begun, from changing his ground, has recently been considered by this court and discussed in an opinion delivered by Mr. Justice GREEN in *Real Estate Co.* v. *Kyoleum Co.,* 142 Tenn., 295, at page 303, 218 S. W., 821, at page 823. In that case it was said that this rule is not one of universal application and that it had been applied by this court in *Snyder* v. *Mystic Circle,* 122 Tenn., 250, because in that case the complainant had been misled to her prejudice by the action of the defendant, and the court therein proceeds to say:

"In *Ault* v. *Dustin,* 100 Tenn., 366, 45 S. W., 981, it is shown that the ordinary application of the rule relied on is in cases where a defendant undertakes to adopt au inconsistent position after litigation has begun, with one formerly taken by him. There is no inconsistency here.

"We think it may be said that the rule urged by the complainant is of doubtful application in any case, unless the former position is inconsistent with the position adopted after litigation, or unless the adverse party had been misled, or is prejudiced by the change of attitude. See *Taylor-Baldwin Co.* v. *Northwestern T. & M. Ins. Co.,* 18 N. D., 343 , 122 N. W., 396, 20 Ann. Cas., 432, and note, 438."

This view of the rule is that taken by Mr. Williston in his work on Contracts, vol. 2, pp. 1412, 1413, who quotes with approval from *Bates* v. *Cashman*, 230 Mass., 167, 119 N. E., 663, as follows:

"While of course one cannot fail in good faith in presenting his reasons as to his conduct touching a controversy, he is not prevented from relying upon one good defense among others urged simply because he has not always put it forward, when it does not appear that he has acted dishonestly or that the other party has been misled to his harm, or that he is estopped on any other ground."

And in a suit on a contract reasoning applicable to the case at bar has been thus clearly set forth:

"But it is said that the plaintiff waived any objection as to the late delivery of the hides; and this is to be considered. The evidence is that he declined receiving them, and alleged as a reason that he had a discharge of the contract from Alva Clement, with whom the contract was originally made. This cannot be considered as a waiver of any other legal objection that he might have to the enforcement of the plaintiff's claim. He might have considered, that one objection which he supposed fatal to the plaintiff's claim was sufficient for him to assign. He was under no obligation to disclose all the defenses it might be in his power to make. If he disclosed a defense then which would be contradictory to his defense at this time. it might destroy it; but if both defenses could subsist at the same time, there is no contradiction, and an assignment of one defense is no waiver of another. Thus if a note was outlawed, and the promisor, on being called up-

on, should say that he had a discharge of the note, or had paid it, it would not preclude him from the additional defense of the statute of limitations, or that it was without consideration. There is no competent evidence of a waiver in this case." *Clement* v. *Clement,* 8 N. H., 210-215.

And see *Hughes Bros. et al.* v. *Ætna Ins. Co. et al.* (Tenn.), 255 S. W., 363.

Moreover, although in very general terms, it appears that Little Bros. in at least one of its communications, the letter of March 10th, did say to the Farish Company, "We have breached no contract—we have no contract with you,"—manifestly detailed explanations of the grounds of defense are not required under any possible application of this rule. It follows from what has been said that this court is constrained to hold with the chancellor that the contracts relied on were never bindingly completed; and, this conclusion being determinative, of the case, the discussion of other questions so exhaustively and ably presented becomes unnecessary.

Affirmed.