FIDELITY BOND & MORTGAGE COMPANY v. AMERICAN SURETY COMPANY.

Western Section. December 16, 1931.

Petition for Certiorari denied by Supreme Court, April 9, 1932.

Charles M. Bryan and Lowell W. Taylor, both of Memphis, for appellant.

Wilson, Kyser, Armstrong & Allen, of Memphis for appellee.

OWEN, J.   The Fidelity Bond & Mortgage Company, hereinafter called plaintiff, has appealed from a judgment rendered against it for cost in the Circuit Court of Shelby county.

The plaintiff sued the American Surety Company on a bond which the defendant had executed for the Grand Lodge of the Independent Order of Odd Fellows of the State of Tennessee. The plaintiff is a Missouri corporation, engaged in the business of making loans, buying and selling bonds, secured by real estate mortgages. The defendant is a New York corporation, engaged in making surety bonds of various kinds and character.

It was alleged that on the 29th day of September, 1925, the Grand Lodge of the Independent Order of Odd Fellows of the State of Tennessee, hereinafter called Grand Lodge, executed a bond with the defendant as surety thereon, which bond was in the sum of $450,000, and it was alleged that the defendant undertook to and did guarantee to the plaintiff that the Grand Lodge would complete in accordance with the plans and specifications prepared by a certain firm of architects, named in the bond, which building was to be erected by the Grand Lodge in Nashville, Tennessee, and which building was a twelve-story, brick and concrete office building with an auditorium, said building to be known as the Medical Arts Building.

It was further alleged by plaintiff, "that relying upon the bond executed by the Grand Lodge, and the defendant, plaintiff agreed to purchase first mortgage bonds of the said Grand Lodge, which bonds were secured by the building and real estate on which it was to be erected.

It was alleged that the purpose of said surety bond was to protect the plaintiff in purchasing the said bonds, by an understanding that the security for said bonds, the building to be erected, would be so erected in accordance with the plans and specifications.

It was further alleged in the declaration that the said building was not completed in accordance with the plans and specifications and the underwriting agreement by and between the plaintiff and the Grand Lodge. It was alleged that the plaintiff was compelled to expend large sums of money in order to carry out the original contract, and partially complete said building.

"This was done by the plaintiff so that its obligation to the holders of the bonds, which it had sold and guaranteed that said bonds would be upon a completed building, should be carried out.

"The building was not completed in that the plumbing, partitions, flooring and the general interior work was not completed when the loan made by the plaintiff herein had been expended, and when the Grand Lodge was unable to proceed in its work, and carry out said contract.

"The said building is still incomplete in that on several floors of the said building, the partitions have not been installed, plumbing has not been put in place, and floors have not been laid, so that upon several floors the building at the present time is only complete as to its exterior constructions."

By an amendment, plaintiff's damages were alleged:

"That on the date of the default of the Grand Lodge in the completion of said building, the fair and reasonable cost of completing the said building, according to the plans and specifications, and underwriting agreement, was in excess of $150,000.

"The bond, executed by the Grand Lodge and the defendant, was exhibited with the declaration, and among the material clauses in said bonds, it is recited that the Grand Lodge is the owner of certain described real estate in Nashville, that it is constructing on said ground, 'a twelve story, brick and concrete office building and auditorium to be known as the Medical Arts Building,' and that said Grand Lodge "is contracting with various contractors for the erection and completion of said office building and auditorium building according to said plans and specifications."

Said bond further recited that the Fidelity Bond & Mortgage Company has underwritten for the Grand Lodge a $450,000 first mortgage bond issue, and the underwriting agreement is thereafter referred to in the bond as the contract.

The bond further recites:

"Whereas, the Fidelity Bond & Mortgage Company, St. Louis, Missouri, and the Nashville Trust Company, Nashville, Tennessee, as Trustee, desires that they themselves and the holders of the bonds be protected against loss by reason of the failure of the Grand Lodge of the Independent Order of Odd Fellows of the State of Tennessee, to complete the office building and auditorium building as described, in strict accordance with the plans and specifications and the contract above referred to:

"The condition of the bond is:

"Now, Therefore, if the said Grand Lodge of the Independent Order of Odd Fellows of the State of Tennessee, shall well and truly complete said building in accordance with and subject to the terms and provisions of the contract and specifications therefor, together

with any and all alterations and additions thereto made in accordance with the terms and provisions of said contract and approved by said Fidelity Bond & Mortgage Company, St. Louis, Missouri, and/or Nashville Trust Company, Nashville, Tennessee, Trustee, for Bondholders, as Obligee, then in such case, this obligation shall be void, otherwise to remain in full force and effect.''

The underwriting agreement referred to in the bond describes the building to be erected as follows:

''12-Story and basement fireproof structure, containing stores on ground floor and high-class offices on all floors above first floor; together with a garage to accommodate seventy or more cars and an auditorium of sufficient size to accommodate eight hundred fifty people; entire building to be modern in every respect, with high-speed elevators, circulating ice water and all other features to meet the requirements of the dental and medical profession.''

The bond recited that it was to protect plaintiff from the failure of the Grand Lodge to complete the building ''as described.''

The defendant filed numerous pleas; by these pleas, it insisted that the building had been completed, that it did not owe plaintiff anything, that the plaintiff had taken over the building and installed partitions, plumbing, etc., as an incident to the operation thereof.

Among its numerous pleas, the defendant, also had the following plea:

''For further plea, defendant says that, without the knowledge or consent of defendant, the plaintiff, Fidelity Bond & Mortgage Company and Grand Lodge of Independent Order of Odd Fellows, to defendant's prejudice, materially changed the manner of constructing and completing the building with respect to the installation of partitions, plumbing and flooring, largely increasing the expense and the time required for performance, which changes were not contemplated under the bond sued on, and by reason of which defendant, as surety, was released and discharged of liability on the bond sued on herein, and defendant's liability terminated.''

The defendant, also, filed a plea, alleging that plaintiff had consented to an extension and enlargement of the time for completion of the building. The defendant, also, for plea stated that the plaintiff had applied the sum of $20,624.76 to the payment of the second year's interest on the $450,000 indebtedness due by the Grand Lodge to the plaintiff and relied on this as a defense.

The cause was submitted to a jury and a verdict returned in favor of the defendant. There was a motion for a new trial, which was overruled, an appeal perfected and the plaintiff has assigned eight errors. By these errors it is insisted:

(1) There was no evidence to support the verdict.

(2) Misconduct on the part of the jury, which misconduct rendered the verdict a nullity.

(3) The court refused three special requests offered by the plaintiff at the conclusion of the original charge.

(4) The plaintiff complains of three excerpts from the court's charge, which statements by the court are alleged to be prejudicial errors. These three complaints are made the basis for assignments six, seven and eight.

This lawsuit presents an immense record of several volumes, several thousand pages of record and exhibits. It was very ably argued at the bar by learned counsel. We have been presented with splendid original briefs and also supplemental and additional briefs filed by counsel for each party after the argument made the day of hearing in this court. It appears that fifteen days were consumed in the trial of this case in the lower court.

At the conclusion of all the evidence there was a motion made by the defendant, based on numerous grounds, for a directed verdict. This motion was overruled. At the conclusion of the court's charge, numerous special requests were submitted by both parties; all of these were refused by the trial judge, except one which was submitted by the plaintiff. The special request offered by the plaintiff and granted by the trial judge is as follows:

"If you find as a fact that the building was not completed as contemplated by the bond, underwriting agreement, and plans and specifications at the time this suit was brought, then the defendant's plea that no notice was given to the defendant becomes ineffective and would constitute no defense to this suit."

It appears that defendants' special requests were not copied in the bill of exceptions. It further appears that after the defendant filed its numerous pleas, it filed a written motion for a bill of particulars, and accompanying this motion was more than thirty interrogatives propounded to the plaintiff, which interrogatives sought to make a discovery as to certain claims made by plaintiff and to allow defendant an inspection of the building. This motion covers sixteen pages of the transcript. Plaintiff demurred to this motion for a bill of particulars, and the demurrer was sustained as to all of the thirty-two interrogatives, except interrogatives numbers 1, 2 and 17. These three interrogatives were answered by the plaintiff, and defendant was permitted to file additional pleas.

It appears that the twelve-story building, known as the Medical Arts Building, located on Seventh Avenue, in Nashville, Tennessee, out of which this litigation has grown, was erected on a lot owned by the Grand Lodge of the Independent Order of Odd Fellows. The first floor of the building was to be used for stores, the second floor

was to be an auditorium that would seat 850 people, and to be used by the Grand Lodge for its Grand Lodge gatherings, etc., and the remaining ten floors were to be used as offices, and it was the intention and desire of the promoters of the building to have this office space occupied by physicians and dentists. The erection of this building was conceived in the mind of Mr. N. V. Sundholm of Memphis, Tennessee, a construction engineer. Mr. Sundholm began his plans and negotiations for this building probably a year before the final contracts, including the bond sued on, were executed. Sundholm was to furnish the architectural service and plans and specifications. The Grand Lodge negotiated with various financing companies to finance the project. Finally the plaintiff was procured to finance the building to be erected by the Grand Lodge. The Grand Lodge appointed a building committee, consisting of five members of the Grand Lodge. The personnel of this building committee was changed from time to time. Two of the more prominent members of the commission were F. M. Lane and R. L. Morris, both of Memphis. Mr. Lane was made secretary of the building committee and he kept the minutes of various meetings of the building committee, at which meetings would be present representatives of the plaintiff and others interested in the building.

Before the plaintiff undertook to underwrite the cost of the erection of said building, the Grand Lodge, by additional financing, agreed to raise the excess of an estimated building cost over the amount of the net proceeds of the first mortgage, which was later executed to secure the plaintiff. Mr. Sundholm, the promoter, agreed to accept second mortgage bonds to cover his engineering and architectural fees, which amounted to about $50,000. The Grand Lodge, also, in addition to the amount due Sundholm undertook to place $100,000 of second mortgage bonds as partial payments to contractors and materialmen and among the various subordinate lodges throughout Tennessee. The underwriting contract contained a cancellation provision should the Grand Lodge be unable to raise the additional sum of $100,000.

On July 14, 1925, a contract was executed between the plaintiff and the Grand Lodge whereby the plaintiff agreed to finance the first mortgage building loan bond issue. Bonds to the extent of $450,000 on a basis which would realize $362,500 net proceeds for construction of said building. The Nashville Trust Company of Nashville, Tennessee, was made Trustee in the trust deed securing the $450,000.

The underwriting agreement provided that the Grand Lodge, "agrees completely to erect on said grounds within twelve months from September 1, 1925."

It was further agreed that the net proceeds $362,500 was to be disbursed by the plaintiff in the construction of said building, but the disbursement was not to begin until after construction had been commenced and paid for by the Grand Lodge from other sources to such an extent that the net proceeds of the first mortgage bonds would be sufficient to pay the balance of the building cost of said building.

It appears that in March 1925, the building commission of the Grand Lodge directed Mr. Sundholm to prepare plans and specifications for the building that was to be erected by the Grand Lodge. Mr. Sundholm secured the services of Alsop and Callahan, architects, and these architects completed their plans in August. On September 15th, the Grand Lodge Building Commission met in Nashville. Alsop's and Callahan's plans and specifications had been adopted, and on said date, September 15th, the main contract for foundation and superstructure of said building was let to Foster and Creighton. Separate contracts were made for the plumbing, heating and ventilation for said building; also for the plastering and also for the electric wiring and fixtures.

The plaintiff was represented in its negotiations as to said building with the Grand Lodge and with the defendant by Mr. Brace, plaintiff's secretary and general counsel, by Mr. McCrea and Mr. Mills, field engineers in the employ of plaintiff. It also appears that Mr. Menteer, the president of the plaintiff company, took an active interest in the negotiations and in the execution of the contract between plaintiff and the Grand Lodge. And on September 15, 1925, the day various contracts for the erection of the building were let, the plaintiff was also in Nashville and represented at a meeting with the building commission by its general secretary and also by McCrae and Mills, its field engineers. Prior to that date, the Grand Lodge had applied to the defendant for a completion bond, but the defendant had declined to issue any bond. It appears that the plaintiff and the defendant had done business with each other in the past similar to the matter now in controversy. So the plaintiff's officers procured Mr. Doenges, the defendant's representative of its St. Louis office, to accompany plaintiff's representatives to Nashville, for a further consultation as to the issuance of a completion bond. On said date, September 15th, Mr. Brace prepared the trust deed, which the Grand Lodge executed to secure plaintiff. After Doenges' visit to Nashville and meeting with representatives of the Grand Lodge and representatives of the plaintiff, upon Doenges' return to St. Louis, he took the matter of writing a completion bond for the Grand Lodge up with defendant's home office, and the bond sued on was executed. Prior to the execution of the mortgage and the letting of contracts, the Grand Lodge

Building Commission had employed a firm of real estate agents in Nashville, Bolling & Heinrichs. These real estate agents were employed for the purpose of procuring tenants for said building and making leases. These real estate agents were to first secure as tenants the Key Doctors of the City of Nashville. It was meant by this to secure as tenants the outstanding physicians and dentists. Bolling and Heinrichs employed one, Cassetty, to procure tenants. It appears that in order to secure these "Key Doctors" and have them execute leases, costly concessions were made to the doctors to agree to furnish these doctors with more costly plans for their suite of offices, than was contemplated in the original plan. And to protect the doctors where they were already tied up with office leases, as counsel for the defendant expresses it, "these agents practically let the Key Doctors write their own ticket." These agents could not secure tenants as rapidly as McCrae, plaintiff's general superintendent on the job thought they should. It appears that Bolling's and Heinrichs' theory as rental agents did not develop into a reality.

On May 3, 1926, at a meeting of the Grand Lodge Building Commission, at which McCrae was present and Bolling and Heinrichs were present, it developed that the rental leases were dragging. McCrae suggested that the Building Commission employ Cook & Company, rental experts of St. Louis, to advise and assist Bolling and Heinrichs in the matter of rentals. Cook & Company were employed, and they sent a Mr. Shannon, one of their agents, to advise with Bolling and Heinrichs. Mr. Shannon came to Nashville, consulted with Bolling and Heinrichs. Shannon made a report to the plaintiff, and among other things, Shannon suggested the following:

"In offering space to prospective tenants, it is necessary, and I would recommend that you make such alterations or rather subdivisions of the space as shown on the typical floor plan, as it is necessary to accommodate the doctors and to comply with their requirements, such as, installation of plumbing, gas, air, etc., for dental units, necessary plumbing for specialists, electric outlets and other requirements which are necessary for physicians and dentists who specialize in their particular line.

"No partitions, however, should be built in until the particular space is actually rented, but provision should be made at this time for some competent construction foreman to remain on the job, to direct the work of building in the various layouts, as fast as the space is leased, and this man should be retained as long as the selling campaign is in progress.

"At this time, only corridor partitions and doors, together with stairways, pipe shafts, and general toilets, should be built in."

McCrae met with the Building Commission on July 2, 1926, and recommended that they follow the suggestions made in Cook & Company's report, and that the installation of partitions, plumbing, gas, electric wiring and fixtures be installed for each tenant after the tenant was secured. The witness Lane, secretary of the Building Commission, testified that the adoption of this plan of Cook & Company's, for which they charged $1000, necessarily stopped the work as to plumbing and fixtures in the office space, also plastering and electrical wiring, etc. At the time of the change, about one-half of the building was rented. It appears that the Hull Plumbing Company, who had the contract for the plumbing and heating of the building, after this change, gave credit for the work and material which would have been installed in the offices under its contract, and proceeded on special orders in such parts of the office space as were rented, and completed its contract December 28, 1926. On that date, a final settlement was agreed upon between the Hull Plumbing Company, the Grand Lodge and the plaintiff's representatives, and the plumbing company gave credit for $4000 of fixtures, which would have been furnished to the office space throughout the building, but the plumbing company furnished and installed in the space leased which was about fifty per cent of the building, $7,500 of fixtures.

There is evidence in the record that, by following the rental plan adopted to secure tenants, the construction of the offices to suit the tenants increased the cost of same from twenty-five to thirty-eight per cent over the contract method of conservative construction specified in the bond, and provided to be completed within one year, and on which the building costs were budgeted. This percentage of increased cost does not include the extra cost for more costly materials and fixtures required in meeting the demands of each particular tenant.

It further appears that McCrae, plaintiff's representative and general superintendent of the erection of said building, had the Grand Lodge Committee to discharge Bolling & Heinrichs. Cassetty, who was the employee of Bolling & Heinrichs, was employed to take charge of the rental and installation of tenants in the building. The discharge of Bolling and Heinrichs on July 13, 1927 was done at the request of McCrae, plaintiff's representative, and Cassetty was put in charge at his request, and on that date, the Building Committee turned over $45,000 additional funds, which the Grand Lodge raised by a third mortgage on said building. It appears that McCrae, at this meeting, threatened to take over the building, and called on the defendant for completion. These proceedings only gave the Building Commission a short life, for on March 22, 1928, the Grand Lodge surrendered its building. It defaulted in payment of principal and interest on the first mortgage

bonds. And plaintiff took possession of said building under the provisions of the trust deed to the Nashville Trust Company. It appears that the building was sold and purchased by the Missouri State Life Insurance Company, who was the owner of all of the first mortgage bonds, the $450,000.

On March 26, 1928, plaintiff wrote the New York office of defendant that the building was not completed, and that the Grand Lodge had advised that it was without funds for completion, and a request was made for advice as to whether the surety would complete the building, or allow the same to be completed by the plaintiff at the surety's expense, to which the defendant replied that the conditions of the bond had been met and that defendant disclaimed all liability thereunder. This was the first notice of any claim of default.

The witness Brace testified that about a year after the construction started the progress of construction was dragging, and in a casual conversation with Doenges, the defendant's St. Louis representative, he stated to Doenges, "it looked as though he might have to make a claim upon defendant's bond; unless the surety preferred, in view of the fact that the Grand Lodge was adding to completion, that he, Brace, 'should let it ride.'" Doenges denies this, however, Doenges does admit that he had some conversations with Brace about a building that was being erected in Denver, and the one also in Nashville, in which Brace said the work on each one was slowing up, but nothing in the nature of a demand on the defendant was made during these casual conversations.

On May 14, 1928, the plaintiff wrote the defendant and expressed the idea that it would be foolish for the plaintiff "to go to the expense of finishing the entire building according to plans and specifications except as tenants are obtained." The defendant replied to the letter on May 28th, and agreed that it would be foolish as stated by the plaintiff, but stated in the close of its letter as follows:

"In reference to entering into an agreement concerning the payment of the cost of fitting the premises for occupancy, I would say we take the position that everything has already been done to meet the obligations of the bond."

On the question of whether or not the defendant had breached its contract, the trial judge charged the jury as follows:

"The suit, as I have stated, is for damages based on alleged breach of a building contract. The first issue therefore for you to determine is whether or not there has been in fact a breach of the contract. The plaintiff claims there has been a breach, and the defendant denies it. If you find this issue in favor of the defendant, this would end the lawsuit, and you need go no further. If, on the other hand, you find this issue in favor of the plaintiff, that is that the building was not completed by the Grand Order of Odd Fellows,

then you will proceed to inquire into the other issues and facts presented for your determination.''

''The plaintiff claims that the defendant has repudiated its obligation by claiming that the building was completed when it was not, and that there was no liability on its part on the indemnity bond, thus making itself liable for a breach of its contract not only for the sums already legitimately expended by the plaintiff, but for such additional sums as may yet be necessary to spend in order to have a completed building. The court instructs you that the rule of law is that if the contract is breached, all the damages resulting may be recovered in one action. And so if you find from the preponderance of the testimony that the defendant has in fact breached its contract, then the plaintiff is entitled to the sums already expended, whatever may be shown by the proof to be the fair and reasonable cost yet to be expended. To ascertain this you will consider the plans and specifications, the underwriting agreement, and all the other proof in the case in the nature of exhibits and the oral testimony of witnesses which bear upon the question of damages, allowing all proper items of expense and excluding all others that were not proper, if any are shown by the proof.

''All questions as to whether the building should have been completed as a whole, or only in part as tenants were obtained, are matters of fact for your sole determination from all the proof in the case. So also are the questions of the character and cost of all interior construction.''

The trial judge also submitted the issue to the jury, whether or not the plaintiff took over the building and proceeded to partially complete it, did plaintiff depart from the plans, specifications and contract, and if so, did it use the proceeds of the bond issue in an unauthorized plan of construction. Plaintiff insists that this question should never have been submitted to the jury, for the plaintiff, by replication, to defendant's plea, wherein defendant pleaded that plaintiff had departed from the plans, specifications, etc. The plaintiff insisted in this replication, that the defendant was estopped to take this position for the reason that the defendant, in denying its liability prior to the litigation, had given its reasons for non-liability other than the reason or defense covered by the plea that the plaintiff had departed from the plans and specifications. We find that there is evidence, and especially by the witnesses Lane and Morris, that the plaintiff and the Grand Lodge departed from the original plans and specifications, and agreed not to complete the office space within the time and manner, and as provided in the contract, plans and specifications, and as provided in the bond. The plaintiff and the Grand Lodge agreed that they would finish or complete the various floor plans for doctors and dentists after the

doctors and dentists were secured as tenants, and according to the desires and wishes of the tenants secured.

It appears that some of the tenants had offices constructed with very elaborate and costly fixtures and partitions, tile floors and tile wainscoting.

The witness Kosmos, a construction engineer of broad experience and who had constructed some office buildings in various states of the union, testified, after an inspection of the Medical Arts Building in Nashville, which is involved in this litigation, that some of the offices were the most elaborate that he had ever viewed or inspected.

We are of the opinion that had the plaintiff and the Grand Lodge not changed the floor plans, the building would have been completed within the year following the execution of the contract and bond.

We are not unmindful of the rule of law, "that a corporate surety for a monetary consideration guarantees the performance of contract and that the contract it executes will be construed more strongly against it." Cambria Coal Co. v. National Surety Co., 141 Tenn., 270, 209 S. W. 641.

In construing the bond under consideration, the contract between the plaintiff and the Grand Lodge and all the documentary evidence connected with this law suit, it was contemplated, in our opinion, that all the work was to be done within twelve months, by continuous work and by unit contracts executed therefor.

When the plaintiff and the Grand Lodge agreed in July 1926 to put in the office space as tenants were procured, this was a departure from the plans of the architects and this change increased the cost of the floor plans at least twenty-five per cent from the original contract, and extended the time for the performance of the contract to no definite period. The contract called for the erection of a

"12-story and basement fireproof structure, containing stores on ground floor and highclass offices on all floors above first floor; together with a garage to accommodate seventy or more cars and an auditorium of sufficient size to accommodate eight hundred fifty people; entire building to be modern in every respect with high-speed elevators, circulating ice water and all other features to meet the requirements of the dental and medical profession."

While it is the duty of the court to strictly construe the contract sued on against the defendant, we would not be justified in expanding the contract beyond what was contemplated by the parties to the contract at the time of its execution. The court cannot make a new contract for the parties.

Said this court in construing a surety contract in the case of National Acceptance Company v. Royal Indemnity Company, 9 Tenn. App., 515, Faw, P. J., speaking for the court:

"It is true, as insisted for complainant, that bonds of the character here involved, when executed for a consideration by companies engaged in that business, are, when considered with a view of ascertaining the nature and extent of the liability assumed, treated by the courts as insurance contracts, and the companies executing same are not in such cases entitled to the favorable consideration accorded to gratuitous sureties." Railroad v. Fidelity & Guaranty Co., 125 Tenn., 658, 690, 148 S. W., 671; Hunter v. Guaranty Co., 129 Tenn., 572, 581, 167 S. W., 692; Green v. Fidelity & Guaranty Co., 135 Tenn., 117, 121, 185 S. W., 726.

But "policies of insurance should be construed, like other contracts, so as to give effect to the intention and express language of the parties." Seay v. Georgia Life Insurance Co., 132 Tenn., 673, 676, 179 S. W., 312; Green v. Fidelity & Guaranty Co., supra; Insurance Co. v. Nelson, 128 Tenn., 70, 157 S. W., 416; Doherty v. Surety Co., 1 Hig., 221, 226; Guarantee Co. of North America v. Mechanics Savings Bank & Trust Co., 183 U. S., 419, 46 L. Ed., 253, 262.

Where completion is prevented by the obligee, or performance carried out only to the extent and in the mode, and as directed by the obligee, the obligation is discharged. Bryan v. Hunt, 36, Tenn., 542.

A surety is released by a change made by the contracting parties, without the surety's consent, in the time, method and manner of construction, not contemplated by the bond, increasing the time, expense, the quality, and amount of work required for performance. The risk of the surety and its rights of subrogation cannot be varied without its consent. Crumley v. Reicon, 4 Higgins, 645.

The trial judge, on the question of the plaintiff having made a material departure from the contract as claimed by the defendant, charged the jury as follows:

"The first of these to which I direct your attention is the special defense set up by the defendant that if the building was not in fact completed as the plaintiff contends, that when the plaintiff, the Fidelity Bond & Mortgage Company took possession in order to complete it under the plans and specifications, that said plaintiff or the Odd Fellows, or both, authorized and consented to a different plan of interior construction than the one authorized by said plans and specifications.

"So the court charges you on this feature of the case, that if you find from the preponderance of the evidence there was a substantial vital departure from the plans and specifications, entailing largely increased expenditures from the building fund, and this was done without the knowledge or consent of the defendant, and without providing other funds to take care of the increased cost

of construction, then this would release the defendant surety company from its obligation on the bond of indemnity, and your verdict should be for the defendant.

"Nor would the defendant be relieved if it knew and consented to material and vital changes, or if such changes were made and the increased cost of completion was provided for by funds of the Odd Fellows or some other source and were not taken from those for building construction derived from the sale of the bonds."

We realize that the issues in this case became very complicated before the trial court and the jury. The trial court, who had held the motion for a new trial under advisement for a number of weeks in overruling the motion for a new trial, said:

"The case was of an unusual nature. While the court had jurisdiction, perhaps the suit should have been tried according to the principles and practices of equity, but suggestions of this nature from the court were not accepted, and the court did not feel that it should arbitrarily direct issues to be made and submitted to the jury.

"The proof offered for the most part was technical, involving contracts, bonds, specifications for erecting the Medical Arts Building at Nashville, together with a mass of expert testimony as to furnishings, completions and costs.

"The jury trying the case were from the body of the county and had no expert training or experience in the complicated matters brought before them."

The plaintiff selected the forum or court in which to try this lawsuit. We find evidence that sustains the verdict of the jury. The first assignment of error is overruled.

The second assignment is in regard to the misconduct of the jury. It appears that by consent of counsel for both parties, the jury was permitted to take the declaration, pleas and the contract sued on, to the jury room and it appears from affidavits of some of the jurors that the foreman of the jury read the contract and stated to the jury, while some of the jurors were voting for the plaintiff and some for the defendant, "that the contract had expired," and some of the jurors stated that they would not have voted for the defendant but they thought that plaintiff was barred by the terms of the contract. We do not think that the plaintiff was prejudiced by the arguments made by various jurors. The court cannot inquire into the various reasons that enter in the minds of the jurors when they have a case under consideration, and the court cannot follow their process of reasoning.

The jury will not be heard to impeach their verdict on the ground of alleged erroneous arguments of the jurors; nor by showing erroneous reasoning, nor by showing that the jury rendered the ver-

dict on a mistaken opinion of the law or facts; and a casual remark as to what may usually exist would not amount to imparting a new fact to the jury, especially when it affirmatively appears that the particular instruments involved, by consent of the parties, were called for and sent into the jury room, and, thereupon considered, with the other facts, in reaching the verdict. Lewis v. Moses, 6 Coldwell, 196; Dunnaway v. State, 3 Baxter, 207; Galvin v. State, 6 Coldwell, 283; Lee v. State, 121 Tenn., 551, 120 S. W., 783; Hughes v. State, 126 Tenn., 49, 148 S. W., 543; Kelly Powell v. Landon, 7 Tenn. App., 97; Whitfield v. Loveless, 1 Tenn. App., 394; Harbin v. Elam, 1 Tenn. App., 499.

Said the Supreme Court in the case of Lewis v. Moses, supra, wherein it appeared by affidavits of jurors that the jury did not arrive at the verdict by correct process of reasoning, and that the jury had resorted to facts not proper to be considered and for principles not applicable to the case:

"If this rule were adopted, but few verdicts would be permitted to stand. Jurors may arrive at the same conclusion, and render the same verdict, but the influences that control their minds, and the process of reasoning by which they arrive at their conclusion, are as diverse as the human mind itself; and the argument and reasons governing each juror in rendering his verdict, might not always be found the most logical, or in accordance with the views of the court."

It results that the second assignment of error is overruled. Assignments 3, 4, 5 and 6 are based on three special requests offered by the plaintiff and declined at the conclusion of the court's charge. These assignments are based upon plaintiffs' insistence that the defendant was bound by two letters written by an official of the defendant in New York. The official being a Mr. Murray. It appears that the defendant wrote two letters to the plaintiff, which letters were written by Mr. Murray, an officer of the defendant. Plaintiff's letters were written by Mr. Brace, the secretary and general counsel of plaintiff. Brace's first letter was dated March 26, 1928. In this letter, the plaintiff claimed a default on the part of the Grand Lodge, and claimed that the defendant surety company was liable on the bond. In that letter, plaintiff asked whether the defendant desired to complete the building or should the plaintiff complete the building and charge the cost of completion to the defendant. The plaintiff stated that it would be foolish for it to go to the expense of finishing the entire building according to plans and specifications except as tenants were obtained. In answering this letter the defendant agreed with plaintiff's suggestion that it would be more practical to do the work as additional space was rented, but defendant closed its letter, by saying:

"In reference to entering into an agreement concerning the cost of fitting the premises for occupancy, I would like to say that we take the position that everything has already been done to meet the obligation of the bond."

In the second letter, the defendant said:

"It is, therefore, our view that the condition of the bond has been met, and for the reasons above stated, and possibly other reasons, we disclaim liability in connection with any further expenditures that may be required."

It is plaintiff's contention that these reasons set forth in the two letters of the defendant, written by Murray, estopped the defendant from its defense that a discharge from the contract, plans and specifications, which was pleaded by the defendant should not be permitted, and the departure contention was inconsistent and irreconcilable with the decision taken by the defendant and the reason given by defendant when it denied liability.

Defendant relies upon Ault v. Dustin, 100 Tenn., 377, 45 S. W., 981; Snyder v. Mystic Circle, 122 Tenn., 264, 122 S. W., 981.

These cases cited, hold that:

". . . when a party gives a reason for his conduct and decision touching anything involved in a controversy, he is estopped, after litigation is begun, from changing his ground, and putting his conduct on another and different consideration."

In Ault v. Dustin, supra, it was held that where the defendant had insisted before suit that the contract had been cancelled, he is not estopped to defend a suit upon the ground that the plaintiff had breached the contract; and that the two contentions are not inconsistent, but the latter is included in the former.

In Snyder v. Mystic Circle, 122 Tenn., 250, cited by plaintiff, the claimant, under the insurance policy there involved, accepted the assurance of the supreme officer of the corporation, who had full knowledge of her divorce, and all of the facts on which it later sought to defend, that if she continued to pay the dues and assessments, she would be entitled to receive the money provided for in the certificate upon proper proofs of loss, and the court held that the acceptance of the assessments and dues, with knowledge of the divorce, constituted a valid waiver of any by-laws provision that would otherwise have prevented the divorce claimant from receiving the benefits of the policy. The court further held that, regardless of the question of waiver, in construing the by-laws, that the complainant there was vested with legal title and with right to maintain the suit in her own name. The facts there presented a case of estoppel in pais, and the expressions of the court with reference to the rule relied upon by the plaintiff here, have no application to the instant case, as is clearly shown from the later decisions of our Supreme Court.

In Real Estate Co. v. Kyoleum Co., 142 Tenn., 302, Judge Green said:

"Moreover, the rule that a party having given a reason for his conduct about a matter in controversy, is estopped, after litigation is begun, from changing his ground, announced in Snyder v. Mystic Circle, 122 Tenn., 250, 122 S. W., 981, 45 L. R. A. (N. S.), 209, is not a rule of universal application. That was a case of estoppel in pais. The complainant was misled to her prejudice by the action of the defendant."

In the case of Canton Cotton Mills v. Overall Company, 149 Tenn., 33, 257 S. W., 394, our Supreme Court held that when the maker of a note, who when called upon to pay, said that he had discharged the note, or had paid it, that such a denial would not preclude him from the additional defense of the statute of limitations, or that it was without consideration.

Said the court, "While of course one cannot fail in good faith in presenting his reasons as to his conduct touching a controversy, he is not prevented from relying upon one good defense among others urged simply because he has not always put it forward, when it does not appear that he has acted dishonestly or that the other party has been misled to his harm, or that he is estopped on any other ground."

We are of the opinion that Murray told the plaintiff, in his letter, that the condition of the bond had been met, and possibly for other reasons that the defendant disclaimed liability in connection with any further expenditures that may be required. We are of the opinion that the defendant was not estopped from interposing the plea complained of, and assignments 3, 4, 5 and 6 are overruled.

Assignments 7 and 8 complain of certain excerpts in the court's charge, wherein the court charged the jury that the plaintiff claimed that at the time the Odd Fellows stopped further construction on the building, that the proceeds of the bonds had been exhausted, that the fitting up of the offices in an unusual and expensive manner was done by the Odd Fellows from other funds that it had raised by second mortgage bonds and from its own resources.

The other excerpt is where the court charged that the defense was made that if the building was not in fact completed as the plaintiff contends, that when the plaintiff took possession in order to complete it under the plans and specifications, that said plaintiff, or the Odd Fellows or both, authorized and consented to a different plan of interior construction than the one authorized by the adopted plans and specifications.

It is insisted that it was error to submit these questions to the jury because,

(1) The plaintiff had not claimed that any offices had been fitted up in an unusual and expensive manner.

(2) The undisputed proof showed that the entire proceeds of the first mortgage bond issue were spent before the plaintiff took the building over on March 22, 1928.

(3) That the defendant had expressly consented to the completion of the interior construction as and when tenants were acquired, by its letters of May 1928 and July 1928, and had expressly stated to the plaintiff that the completion of the building in that manner would not in any wise prejudice its rights.

"The whole charge of the court must be considered together and with reference to the facts of the case, in order to determine whether it is correct or not." Lovier v. City of Nashville, 1 Tenn. App., 409.

"Where the charge is erroneous, yet as applied to the facts of the particular case is harmless, the case will not be reversed." Oliver v. Nashville, 106 Tenn., 273, 61 S. W., 273; Dale v. Continental Ins. Co., 95 Tenn., 38, 31 S. W., 266.

Taking the court's charge as a whole, we are of the opinion that there is no reversible error in the charge, that the plaintiff was not prejudiced in its rights by what the court said in the excerpts complained of when taken into connection with the entire charge.

It results that we find no reversible error in the record. All of the assignments are overruled and disallowed. The judgment of the lower court is affirmed. The plaintiff and its surety on appeal bond will pay the cost of the appeal. The cost of the lower court will be paid as adjudged in the trial court. Execution will issue accordingly.

Heiskell and Senter, JJ., concur.