**Clara Brainard WAGNER, Plaintiff-Appellee,**

v.

**Walter G. FRAZIER, Jr., Defendant-Appellant,**

**United States Fidelity and Guaranty Company, Defendant-Appellant,**

**James R. Reed and Leon Denney, Defendants.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Feb. 11, 1986.

Permission to Appeal Denied by Supreme Court May 27, 1986.

Hugh C. Howser, Trabue, Sturdivant & DeWitt, Nashville, for plaintiff-appellee Clara Brainard Wagner.

Louis Farrell, Jr., Nashville, for defendant-appellant USF & G.

Glendon Fisher, Jr., Nashville, for defendant-appellant Walter G. Frazier, Jr.

Tom Harris, Ashland City, for defendants Denney and Reed's Ins. Agency.

## OPINION

CANTRELL, Judge.

This is a dispute between an owner-developer and the general contractor and his surety. The contractor asserts on appeal that the evidence preponderates against the judgment of the Chancellor. The surety asserts, in addition to several suretyship defenses, that because the plaintiff died during the pendency of the suit and the case was not revived within ninety days of the suggestion of death the Chancellor should have dismissed the action.

In 1975 Clara Brainard owned a farm in Montgomery County near the City of Clarksville. Part of the farm lay along the bank of the Cumberland River. In 1977 she decided to construct a marina at the river's edge and sought a loan guarantee from the Small Business Administration. With the help of the Small Business Administration guarantee, she obtained the loan from the United American Bank in Memphis. At the same time Mrs. Brainard was also developing a subdivision on another part of the property and she hired Mr. Walter G. Frazier to do some of the grading on that project. While thus engaged, Mr. Frazier became interested in doing the work on the marina and he helped Mrs. Brainard to get the loan documents together. His estimate of the cost of the project was used in the loan application. Mr. Frazier actually did some of the preliminary grading on the marina site before the loan was approved by the United American Bank. For this work Mrs. Brainard paid Mr. Frazier on an hourly basis.

On May 23, 1978, Mr. Frazier and Mrs. Brainard signed an agreement whereby Mr. Frazier agreed to construct the marina according to the plans and specifications for a price of $249,762.00. The price included $31,132.00 for work that Mr. Frazier had previously done and for which he had been paid by Mrs. Brainard. Mr. Frazier furnished Mrs. Brainard a performance bond and a labor and materials payment bond with the United States Fidelity and Guaranty Company as surety. The bonds were procured through the Reed Insurance Agency in Ashland City, Tennessee.

After the execution of the contract, Mr. Frazier continued the excavation work and made good progress until July of 1978 when he struck rock and a heavy rain flooded the site. The record is in conflict

about whether Mr. Frazier ever returned to the job site in an effort to complete the job. It is undisputed that he and Mrs. Brainard agreed to secure the help of another excavating contractor to be paid on an hourly rate from the construction loan.

In January of 1979 Mrs. Brainard had some meetings with Mr. Frazier about getting the work finished. About that time she also decided to call on USF&G, the bonding company, and have it pick up the work for Mr. Frazier. When she called the bonding company Mrs. Brainard discovered that they did not have a record of the bond in Nashville. Apparently because of a call from USF & G to the agency in Ashland City, Mr. Reed and Mr. Denney from the agency visited Mrs. Brainard and told her that they had pocketed the premium, and that there was no performance bond. They persuaded her to call USF&G in Nashville and tell them that she had been mistaken, that the bond had been placed with another company. She proceeded to do so, as she testified, upon their promise to see that she did not lose anything from not having a bond.

Later, Mr. Denney and Mr. Reed returned the bond premium to Mrs. Brainard in three separate checks. Although the bond premium had been paid by Mr. Frazier, Mrs. Brainard deposited the checks in her account, because, she said, she thought the payments from Mr. Denney and Mr. Reed were in fulfilment of their promise to help pay the outstanding bills and to see that she did not suffer from losing the bond.

After some extended negotiations and an examination of all the relevant transactions, Mrs. Brainard and Mr. Frazier executed an agreement on February 23, 1979 whereby Mr. Frazier agreed to pay approximately $58,000.00 of the cost overruns on the excavation contract, to complete certain phases of the work as outlined by the engineering company and to pay other incurred expenses up to a total of $109,000.00 if they did not result from additions to the original contract.

On June 14, 1979, Mr. Frazier received a handwritten list from the engineering company containing five items that had to be completed. On June 28, 1979, he reported that these items had been finished. In an answer to his letter the engineering company replied that the original list had not been satisfactorily finished and that other work that was included in the original contract remained unfinished.

In the meantime, on June 13, 1979, Mrs. Brainard's attorney sent a letter to the Reed agency with a copy to USF & G saying that Mrs. Brainard did not consider the bond cancelled and that she had accepted a return of the bond premium under a mistake of fact. The letter tendered a check for $4,500.00 to the agency for the bond premium and declared that Mr. Frazier was in default. Although the agency returned the check tendered by Mrs. Brainard, for some reason USF & G billed the agency and collected the premium on the bond.

Mrs. Brainard brought this action on March 4, 1980. After a hearing to determine the question of liability and another to determine her damages, Mrs. Brainard died on September 27, 1983, while a decision on the amount of damages was pending. One of the defendants filed a suggestion of death on October 7, 1983. When no action was taken to substitute the proper parties as plaintiffs within ninety days after the suggestion of death, the defendants filed a motion to dismiss under Rule 25.01 of the Tennessee Rules of Civil Procedure. In response to the motion to dismiss, the co-administratrixes of Mrs. Brainard's estate filed two motions on January 16, 1984. The first motion sought to substitute the two administratrixes as plaintiffs, asserting that letters testamentary had been issued to them on October 24, 1983. The second motion sought an extension of time beyond the ninety days allowed in Rule 25.01 for filing a motion of substitution. The defendants opposed both motions on the ground that Rule 25.01 was mandatory and that, in any event, the movants had not shown any reason for the extension. The Chancellor overruled the motion to dismiss

and granted the motion for an extension of time for the substitution. The reasons given by the Chancellor were (1) the time lapse was not an unreasonable one, (2) the case had been heard in its entirety, and (3) as a matter within the court's discretion only "dire" circumstances would compel dismissal.

### The Rule 25 Issue

The rule governing substitution of parties upon a suggestion of death is Rule 25.01 of the Tennessee Rules of Civil Procedure. It reads as follows:

25.01 DEATH (1) If a party dies and the claim is not thereby extinguished, the court may order substitution of the proper parties. The motion for substitution may be made by any party or by the successors or representatives of the deceased party and, together with the notice of hearing, shall be served on the parties as provided in Rule 5 and upon persons not parties in the manner provided in Rule 4 for the service of process. Unless the motion for substitution is made not later than 90 days after the death is suggested upon the record by service of a statement of the fact of the death as provided herein for the service of the motion, the action shall be dismissed as to the deceased party.

So far as we can tell, the precise question in this case has not been decided in Tennessee since the adoption of the Rules of Civil Procedure in 1971. However, decisions under prior law may be helpful. Under prior law the suit was subject to abatement when the second term had passed after the death of a party had been suggested and proved or admitted. T.C.A. § 20–604 [repealed]. But the right to revive the action continued to any time before an actual order of abatement had been made and entered on the record. *Churchwell v. Bank of East Tennessee,* 48 Tenn. 780 (1870). The revivor could be allowed after two terms had passed even though a motion to abate was pending. *Brooks v. Jones,* 73 Tenn. 244 (1880).

In general the above cases are in line with the decisions in the federal courts that have construed Rule 25(a) of the Federal Rules of Civil Procedure. The federal rule is almost identical to our Rule 25.01. Each says that the action "shall" be dismissed if ninety days pass after the death of a party is suggested on the record without a motion for substitution having been made. Notwithstanding this language in Rule 25(a), most of the federal courts considering the problem have held that Rule 6(b)(2) of the Federal Rules of Civil Procedure allows the courts to enlarge the time for making substitution beyond the time set in Rule 25(a) even if the motion is made after the ninety day period has run. *Staggers v. Otto Gerdau Company,* 359 F.2d 292 (2nd Cir.1966); *Blair v. Beech Aircraft Corp.,* 104 F.R.D. 21 (1984); *Tatterson v. Koppers Co.,* 104 F.R.D. 19 (1984). The latitude allowed by Rule 6(b)(2) however, is subject to the requirement that the failure to move within the time allowed be a result of "excusable neglect". *Farrington v. Benjamin,* 100 F.R.D. 474 (1984); *Urban v. Talleyville Fire Co.,* 732 F.2d 147 (3rd Cir. 1984).

Since federal rule 6(b)(2) is identical to 6.02(2) Tenn.R.Civ.P., we think our Rule 25.01 should be construed to allow substitution of parties after the ninety day period has run if the failure to move within the period is the result of excusable neglect. As is generally true, the kind of excuse that will satisfy this requirement is a function of the length of time that has passed and the possible harm to the opposite party. In this case where the suit had been fully tried and the parties were awaiting a decision from the court and the motion was made eight days after the ninety day period had run, we think the mere oversight of the plaintiff is excusable.

After a hearing on the liability question the Chancellor concluded that Mr. Frazier was bound by the contract of May 1978 and that he had breached the agreement by failing to finish the work called for in the agreement.

Mr. Frazier contends that he was only a front for Mrs. Brainard because she had to have a general contractor in order to get

financing for the project, that she was in fact the general contractor and his only duty was to do the excavation work on an hourly basis.

There are some aspects of the case that lend credence to that contention. After the heavy rain in July of 1978, Mrs. Brainard and Mr. Frazier negotiated with another construction company to send equipment to carry on the excavation; the bills were apparently paid from the construction loan; Mrs. Brainard appeared to some witnesses to be in charge of the project rather than just the obligee on a construction contract; she collected most of the draws on the loan from the bank and made the disbursements to various subcontractors. However, she adamantly denied that she did not consider Mr. Frazier bound on the construction contract and Mr. Frazier did agree in 1979 to pay all of the cost overruns on the project that were not the result of changes in the scope of the work. His action in that respect is in irreconcilable conflict with his position that he was merely the front for Mrs. Brainard in a sham transaction.

The Chancellor resolved the credibility issue in favor of Mrs. Brainard. His resolution of that issue is binding on this court unless other real evidence in the record compels another conclusion. *State ex rel. Balsinger v. Town of Madisonville,* 222 Tenn. 272, 435 S.W.2d 803 (1968). We do not think the record compels the conclusion that the Chancellor was wrong on that issue.

In addition, the Chancellor's other findings of fact are presumed to be correct unless the preponderance of the evidence compels a different conclusion. Rule 13(d) Tenn.R.App.P. We are satisfied that the evidence does not preponderate against the Chancellor's findings.

### Damages

The Chancellor, after conducting another hearing on the question of damages, filed a memorandum in which he outlined his findings. He started his analysis by a finding of how much Mrs. Brainard had spent. He then added the estimated items included in the contract that had not been completed or installed. Then he deducted from the total figure certain items that were not within the original contract and therefore not the responsibility of Mr. Frazier. The result was a judgment for Mrs. Brainard in the amount of $48,198.00, plus interest at 10% from July 1, 1979.

Mr. Frazier contends that the draws from the construction loan went into the account of Mrs. Brainard instead of being paid to him. He does not cite the pages in the record that support that conclusion. *See* Rule 27(g) Tenn.R.App.P. However, we think the record is clear that the payments the Chancellor found had been made for the work called for under the contract were actually paid by Mrs. Brainard. Whether she paid Mr. Frazier or someone else to complete the work he contracted to perform, the result is the same. Again, Mr. Frazier did not complain at the time. Instead, in February of 1979, he agreed to immediately pay the cost overruns that were not a result of additions to the work. We think the Chancellor's calculations on the amount of damages were correct.

Mr. Frazier also contends that the parties reached an accord and satisfaction in February of 1979 when he agreed to pay certain claims and to finish the work called for under the contract. However, we cannot agree that Mr. Frazier fully performed what he promised under the agreement of February 23, 1979. In that memo he promised to do three things: (1) pay outstanding bills of $58,000.00; (2) complete the original contract at his own expense based on an outline by the engineering company of the work to be done; and (3) pay the difference between $109,000.00 and $58,000.00, less any costs that should have been called "extras" under the agreement. He paid approximately $56,000.00 but there is a dispute in the proof about whether he completed the contract according to the outline by the engineers of work to be done. Apparently the parties never attempted to come to an agreement about how much Mr. Frazier owed in addition to the $58,000.00. Therefore, Mr. Frazier never performed what he promised in the agreement.

Therefore, according to the prevailing rule he is not discharged from the original obligation.

[T]he failure to make a payment or otherwise perform required by a new agreement entered into in satisfaction of a debt or claim leaves such an agreement a mere executory accord without satisfaction, and as such it constitutes no bar to the enforcement of the original claim or debt. 1 Am.Jur.2d, Accord and Satisfaction, &47.

### The Suretyship Defenses

a. Estoppel.

The bonding company contends that Mrs. Brainard is estopped to call on it to perform under the completion bond. The facts relied on by USF&G are these: Mrs. Brainard called the bonding company in January or February of 1979 and advised the company that she was calling the bond. Later, after a conference with the insurance agency that furnished the bond, she called back and reported that she had made a mistake, that the bond had apparently been placed in another company. At this point USF&G called off their investigation into the potential liability.

■ Up to that point the facts might support a conclusion that Mrs. Brainard would be estopped to claim the benefit of the bond. A representation by one party and a change of position in reliance on the representation are the ingredients of an estoppel. *Provident Washington Ins. Co. v. Reese*, 213 Tenn. 355, 373 S.W.2d 613 (1963). However, when Mrs. Brainard's lawyer demanded performance from the bonding company in June of 1979 and the company learned that a bond had in fact been issued, the company billed the agency for the premium and collected it. We think that amounts to a ratification of the bond and negates the bonding company's insistence that they relied on the representations of Mrs. Brainard to their detriment.

A ratification occurs when the party, knowing all the facts necessary to form an opinion, deliberately assents to be bound. *State ex rel. Robertson v. Johnson County Bank*, 18 Tenn.App. 232, 74 S.W.2d 1084 (1934). Here we think the conclusion is inescapable that the bonding company in June of 1979, deliberately assented to be bound by the acts of its agents in issuing the bond. The company does not contend that the collection of the premium resulted from a mistake of fact or was made without full knowledge of the facts involved. Therefore, we do not think that estoppel is a defense to this action.

b. Failure to have plans and specifications for the project.

■ The bond in this case made USF&G surety for performance by Mr. Frazier "in accordance with the drawings and specifications prepared by Engineering Planning Services, Inc." The engineering company prepared certain plans for the project but did not prepare the specifications for all of it, notably the specifications for the metal building and the electrical and plumbing work. USF & G insists that this situation amounts to a material change of risk which releases the surety. We are of the opinion that the facts do not bring this case within the rule cited. The risk is the same risk the company undertook in bonding Mr. Frazier. It has not changed because the specifications are inadequate; they were inadequate when the bond was issued, and if the lack of specifications rendered the required performance of Mr. Frazier uncertain, the same uncertainty existed in the beginning. Therefore, we do not think the lack of specifications materially increased the risk of the bonding company.

c. Failure of the owner to meet the schedule of payments called for in the contract.

The bonding company asserts that it was released by the failure of Mrs. Brainard to make the scheduled payments in the contract. The record does show that Mrs. Brainard paid other contractors and suppliers out of the funds derived from the construction loan and she did not pay the scheduled payments to Mr. Frazier. She also paid many bills with her own funds or

funds that came from other sources. It does not appear that she diverted any of the funds to her own use or that completion of the job was made any more difficult because of the way the payments were handled.

We agree that where completion of a job is prevented by the obligee the surety on a completion bond is released. *Fidelity Bond & Mortgage Co. v. American Surety Co.*, 14 Tenn.App. 211 (1931). That is another way of saying that the risk to the surety has been materially increased. However, where the owner pays subcontractors and suppliers directly—some at least with the consent of the general contractors—we think the risk to the surety has not been materially increased. Therefore, we do not think this is a defense that is available in this case.

d. Material changes in the project.

When Mr. Frazier unexpectedly encountered rock during the excavation of the marina basin the scope of the contract changed. At some point the engineering company also decided to change the slope of one of the banks which resulted in additional dirt removal. The Chancellor found that the cost of the extra rock and dirt removal amounted to $77,130.00. There were other changes that added to the cost of the entire project. The bonding company asserts that this material increase in the work discharged it as surety on the contractor's bond.

We do not agree that such changes without the consent of the surety work a release on the surety's obligation. If that were the case no "extras" could ever be allowed in a construction project without releasing the surety. It is true that where the parties enter new agreements which in effect terminate the old, the surety is not obligated under the new contracts but its liability is fixed as of the date of the new agreement. *Southern Construction Co. v. Southern Surety Co.*, 10 Tenn.App. 506 (1926). Also where the extensive changes exhaust the building fund, the surety may be discharged *if the changes are not funded from some other source. Fidelity Bank & Mortgage Co. v. American Surety Co.*, 14 Tenn.App. 211 (1931). *See also Perkins Oil Co. v. Eberhart*, 107 Tenn. 409, 64 S.W. 760 (1901). However, none of those factors are present here. We do not think the changes in the scope of the work increased the risk to the surety.

The judgment of the lower court is affirmed and the cause is remanded to the Chancery Court of Montgomery County for any further proceedings necessary. Tax the costs on appeal to the appellants.

TODD, P.J. (M.S.) and LEWIS, J., concur.