JOHN E. MASON, )



# FILED

**October 28, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

)

Plaintiff/Appellant, )

                    )      Appeal No.

v.                             )     01A01-9807-CH-00389

                    )

CAPITOL RECORDS, INC.,      )     Davidson Chancery

                    )     No. 98-865-II

Defendant/Appellee.       )

COURT OF APPEALS OF TENNESSEE

APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE

THE HONORABLE CAROL McCOY, CHANCELLOR

JAMES A. DELANIS
Baker, Donelson, Bearman & Caldwell
1700 Nashville City Center
511 Union Street
Nashville, Tennessee 37219

C. BENNETT HARRISON, JR.
Cornelius & Collins
2700 Nashville City Center
511 Union Street
P. O. Box 190695
Nashville, Tennessee 37219
      ATTORNEYS FOR PLAINTIFF/APPELLANT

AUBREY B. HARWELL, JR.

GERALD D. NEENAN
JOHN M. PRICE
Neal & Harwell
2000 First Union Tower
150 Fourth Avenue North
Nashville, Tennessee 37219
       ATTORNEYS FOR DEFENDANT/APPELLEE


AFFIRMED AND REMANDED


WILLIAM B. CAIN, JUDGE

# O P I N I O N

This case involves a purported sale by the defendant, Capitol Records, Inc., to the plaintiff, John E. Mason, of a building previously constructed by Capitol Records on 25 Music Square West in Nashville. The chancellor granted summary judgment to Capitol Records holding that there was never a meeting of the minds between the parties and thus no mutually enforceable contract. Mason appeals from this grant of summary judgment. For the following reasons, we affirm the decision of the trial court.


I.


Capitol Records initiated construction of the building in issue in this case as headquarters for its operations. In November 1997 when the building was almost completed but still unoccupied, a change in management occurred at Capitol Records and the new management team determined to sell the building rather than occupy it. Capitol Record's new president, James Patrick Quigley, instructed Tom Becci, Capitol's vice president in charge of finance and administration, to immediately try to sell the building.

Negotiations between John Mason and Tom Becci began and resulted in a series of written and oral communications which must be chronologically analyzed in

order to determine the following issues:

1) Whether or not the parties ever reached an agreement;

2) Whether or not the written documentation of such purported agreement would satisfy the statute of frauds; and

3) Whether or not Capitol Records is estopped to rely upon the statute of frauds.

Since Mason appeals the grant of a summary judgment, all evidence in the record and all reasonable inferences to be drawn from such evidence must be construed in the light most favorable to Mason. *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993).

Initially, we note that Becci was an employee of Capitol Records which was a subsidiary corporation of EMI, the parent corporation headquartered in New York. On November 17, 1997, Mason made his first written proposal to Becci with a tentative $6,600,000 dollar offer for the building, contingent upon EMI first leasing the building to acceptable tenants so as to produce $820,000 dollars per year rentals.

On December 9, 1997, Becci advised Mason that this proposal was probably acceptable but he would have to obtain approval from New York. On that same day, Quigley informed Mason that he approved the proposal and would present it to Ken Berry, Chief Operating Officer of EMI.

On January 16, 1998, Mason made a more detailed written proposal, containing in part the following provisions:

Subject to the completion and execution of the Purchase Agreement, Purchaser and Seller agree as follows:

1. Purchase Price. The total purchase price for the Property shall be $6,600,000 (the "Purchase Price") payable at closing in immediately available U.S. funds, subject to adjustment as described herein.

. . .

3. Representations and Warranties. The Purchase Agreement shall contain representations and warranties of the Seller which are customary for a transaction[ ] such as proposed in this letter, including but not limited to, representations and warranties of the Seller generally to the effect that (i) Seller is vested with

marketable fee simple title to the Property, free and clear of any encumbrances; (ii) the Property complies with all applicable governmental laws and regulations (including building codes, zoning and environmental laws), (iii) the Building is complete in accordance with the plans and specifications reviewed by Purchaser and that all Building systems are in good working order; and (iv) the Building is connected to and serviced by all necessary public utilities.

. . .

6. <u>Conditions</u>. The Purchaser's obligations to purchase the Property shall be conditioned upon the following:

   a. Purchaser's ability to obtain financing in an amount not less than $4,950,000 upon terms acceptable to Purchaser, in his reasonable discretion.

   b. Purchaser's satisfaction, in Purchaser's reasonable discretion, with the state of title to the Property, as reflected by the Title Policy.

   c. Purchaser's satisfaction, in Purchaser' sreasonable discretion, with the Survey.

   d. Purchaser's satisfaction, in Purchaser's reasonable discretion, with the physical condition of the Property.

   e. Purchaser's satisfaction with the results of an environmental site assessment conducted by Purchaser upon the Property.

f. [T]he building being 100% leased at an average base rental rate of $20.50 per square foot.

7. <u>Leasing</u>. Seller shall be responsible for leasing the Building prior to the Closing Date. The terms and conditions of all such leases shall be subject to the approval of Purchaser, which approval shall not be unreasonably withheld or delayed.

. . .

9. <u>Closing</u>. The closing of the sale and purchase of the Property (the "Closing") shall occur within 60 days following the

satisfaction of all conditions, but in [no] event more than 180 days from the date of the Purchase Agreement.

    10. <u>Assignment</u>. The Purchase Agreement may be assigned by Purchaser to an entity in which Purchaser owns not less than 25% of the aggregate equity interests, without the consent of Seller. Upon such assignment, the Assignee shall become the "Purchaser" and Purchaser shall be released from all obligations hereunder.

On February 4, 1998, Becci and Quigley asked Mason what he would pay for the building without a leasing contingency to which Mason responded that he would pay $6.1 million dollars. The next day Becci orally told Mason the offer was acceptable and to put it in writing. On February 5, 1998, Mason issued a revised letter, deleting the leasing requirements previously contained in his January 16, 1998 letter, and offering what amounted to a $6.1 million dollar purchase price. A second copy of the February 5 letter was forwarded by Mason to Becci on February 13, 1998, revised by Mason's attorney, Kenneth Ezell, whereby the earnest money required was increased and the closing date was set for March 24, 1998. On February 17, 1998, Becci responded to Mason by letter:

> I am writing to let you know that the financial terms outlined in your February 13 letter are acceptable to Capitol Records. However, your letter addresses a number of other terms which, in our view, are more appropriately addressed in a formal contract of sale. We expect to be using Shack & Siegel, P.C., of New York City, as our counsel in this matter, and we have instructed them to begin work on a contract of sale at once. As you know, we are very interested in concluding a sale of this property to you. However, we did want to be sure that it is understood that there can be no binding agreement between us unless and until a formal contract of sale, satisfactory to both parties and to our attorneys, has been signed and delivered.

Following this February 17, 1998 letter, attorney Jeff Stone of New York, representing Capitol Records, forwarded to Ezell a proposed draft of the contract deleting "representations and warranties" therefrom and inserting "as is" language into the proposed contract. On February 27, 1998, Mason responded by e-mail to Becci concerning the subject of this "as is" language rather than the "representations

and warranties" contained in his February 13 proposal and all of his previous proposals. Mason wrote as follows:

> Subject: The building contract
>
> Capitol's N.Y. attorney continues to maintain the absurd position that Capitol will not warrant anything regarding title, construction, etc. and that the building is being sold "as is". This said to be " the way things are done in New York". It is most assuredly NOT the way things are done in Tennessee or out here in the west. I am licensed to practice law in three states - Calif., Nevada and TN. None of them has such a ridiculous standard. I need to either speak to you immediately or receive your assurance that this can be resolved today. We are all being held up by this issue and your attorney's intransigence. Regards, John Mason.

On March 10, 1998, Ezell attempted to contact Stone in furtherance of the contract but was unable to reach him. On March 11, 1998, Stone informed Ezell that defendant had received a higher offer for the building from a third party and defendant thereafter sold the building to this third party.

## II.

The first issue presented for review by the appellant involves the question of whether Mason and Capitol agreed on the essential terms of the sale of the Capitol Building so as to form an enforceable agreement when they agreed on the price, the earnest money, the closing date, and other provisions. In ruling on the motion for a summary judgment, the chancellor made the following statement:

> Taking the evidence in the light most favorable to the Plaintiff, were I to assume that the February 17, 1998 letter was a commitment sufficient to form a binding contract, I would then have the question of whether it was enforceable.
> I can't find an enforceable contract. I have gone back to my primer of what is the basis of a contract and that's adequate consideration, mutual assent to the terms of the agreement, and that it was significantly definite to be enforceable.
> I have read as much as I can possibly read. I have reflected on my obligation, not to decide a Motion for Summary Judgment if I

have any – let me find what the term is – if I have any concern that there are facts in dispute that would be material on this issue, and I can't find it.

I said that at the temporary injunction, I'm saying it again. I don't find an enforceable contract. And that's in viewing all the facts in the light most favorable to Mr. Mason.

In going back to her "primer," the chancellor might well have accepted this court's analysis in *Tullahoma Concrete Pipe Co. v. T. E. Gillespie Construction Co.*, 56 Tenn. App. 208, 405 S.W.2d 657, 665 (1966), wherein the court outlined a basic principle of acceptance:

> In *Ray v. Thomas*, 191 Tenn. 195, 232 S.W.2d 32, our Supreme Court held that acceptance of an offer must exactly and precisely accord with the terms of the offer.
>
> In the early case of *Canton Cotton Mills v. Bowman Overall Co.*, 149 Tenn. 18, 257 S.W.398, our Supreme Court quoted from Corpus Juris and Ruling Case Law as follows:
>
>> The controlling rule of law is elementary, but it is well stated in 13 Corpus Juris, 281, as follows:
>>
>> "An acceptance, to be effectual, must be identical with the offer and unconditional. Where a person offers to do a definite thing, and another accepts conditionally or introduces a new term into the acceptance, his answer is either a mere expression of willingness to treat, or it is a counter proposal, and in neither case is there an agreement." Again in 6 R.C.L., 608, it is said: "In order that there may be a meeting of the minds which is essential to the formation of a contract, the acceptance of the offer must be substantially as made. There must be no variance between the acceptance and the offer. Accordingly a proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation unless the party who made the original offer renews it, or assents to the modification suggested."
>>
>> And to the same effect is 1 Williston on Contracts, p. 57. These text-book statements of the rule are well supported by the authorities cited, and, applying this rule to the facts of this case, it must be held that the

contracts sued on were not finally consummated.

*Canton Cotton Mills v. Overall Co.*, supra, page 31, 257 S.W. page 402.

From the first offer to purchase on January 16, 1998 through the last revision of the February 5, 1998 offer submitted on February 13, 1998, Mason never deviated from his insistence that the purchase agreement must contain the "representations and warranties" set forth in paragraph 3 of the January 16, 1998 letter, and conditions *a* through *f* of paragraph 6 of that letter. This is true even though the final February 5-13 proposal contained a conditional waiver of these "conditions" unless written notice was given by purchaser to seller of dissatisfaction within thirty days following the date of the purchase agreement.

The February 17 letter from Becci to Mason made clear that only the financial terms of the February 13 letter were acceptable and that all "other terms" would be addressed in the formal contract of sale. This letter likewise included the following statement of intention: "[W]e did want to be sure that it is understood that there can be no binding agreement between us unless and until a formal contract of sale, satisfactory to both parties and to our attorneys, has been signed and delivered." The next communication was the Stone draft of a proposed contract changing the provisions of the Mason offer so as to delete the "representations and warranties" provisions of the offer and insert in lieu thereof the "as is" provisions so strenuously objected to by Mason in his February 27, 1998 e-mail to Capitol Records.

At this final stage of communication between the parties, there was simply no mutual assent of the parties or mutuality of obligation. Mason could not have forced Capitol Records to convey the property with the "representations and warranties" of his offer and Capitol could not have forced Mason to accept conveyance of the property "as is." Under these circumstances, Mason's proposal constitutes an offer and the Stone proposal for Capitol represents a counter offer. Either the offer or the counter offer or both could have been withdrawn at any time

prior to acceptance. This court has held as follows:

> Before the agreement was binding upon the complainant it would have required his assent, which would amount to an acceptance of an offer to purchase, and, if defendant through his authorized agent withdrew the offer, for any reason, before it was accepted by the complainant, it was not a binding agreement upon either party, and non-enforcible.
>
> 6 R. C. L., 604, states the rule: "So long as the offer has been neither accepted nor rejected, the negotiations remain open and impose no obligation on either party. The one may decline to accept or the other may withdraw his offer; as either rejection or withdrawal leaves the matter as if no offer had ever been made."

*Coate v. Tigrett*, 4 Tenn. App. 48, 53 (1926).

It was Mason in his February 13 offer who proposed the "representations and warranties" provisions. Becci's letter of February 17 accepted only the financial terms of the Mason offer. One simply cannot construe the February 17, 1998 letter as an unconditional acceptance by Capitol of the Mason offer. When the counter-proposal by Stone in behalf of Capitol substituted the "as is" language in contrast to the "representations and warranties" language of the Mason February 13, 1998 offer, Mason did not accept this counter-proposal but vigorously protested it. Stone was attorney for Capitol Records and Ezell was attorney for Mason. The obvious stalemate between the parties is best stated by Ezell in his deposition: "Q. You two just were at an impasse until you worked out those basic issues? A. I think that's right."

Without ever resolving this impasse, Capitol Records withdrew from the negotiations with Mason and sold the property to a third party. The chancellor was correct in holding that she did not "find an enforceable contract. And that's in viewing all the facts in the light most favorable to Mr. Mason."

## III.

While this holding that no contract existed between the parties is

dispositive of the case, if we are in error in this holding and there are factual issues sufficient to survive summary judgment we must next address the statute of frauds relied upon by Capitol Records. Plaintiff asserts that the combination of letters and documents in the record is sufficient to satisfy the statute of frauds. Tenn. Code Ann. § 29-2-101(a)(4). The statute of frauds provides in pertinent part that no action shall be brought upon any contract for the sale of lands "unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party." *Patterson v. Davis*, 28 Tenn. App. 571, 192 S.W.2d 227, 229 (1945). The "party to be charged" is the landowner, in this case Capitol Records. *Id.*

In the instant case we are dealing not with a written, signed and conditioned offer to sell by the vendor, but a written offer to purchase by the vendee on specific terms and conditions set by the prospective purchaser. We have no signed memoranda of the vendor accepting the terms and conditions upon which the prospective vendee proposed to buy the property. The only document "signed by the party to be charged" in this case was the Becci letter of February 17, 1998. This document either standing alone or in combination with any documents referred to therein satisfies the statute of frauds only to the extent of the financial terms of the contract. This is insufficient in law.

Justice Humphreys, speaking for the Tennessee Supreme Court, made the following observation:

> The rule by which the thirteen instruments exhibited to the bill as memoranda satisfying the Statute of Frauds must be tested is well stated thusly: "The general rule is that the memorandum, in order to satisfy the statute, must contain the essential terms of the contract, expressed with such certainty that they may be understood from the memorandum itself or some other writing to which it refers or with which it is connected, without resorting to parol evidence. A memorandum disclosing merely that a contract had been made, without showing what the contract is, is not sufficient to satisfy the requirement of the Statute of Frauds

that there be a memorandum in writing of the contract."

*Lambert v. Home Fed. Sav. & Loan Ass'n*, 481 S.W.2d 770, 773 (Tenn. 1972) (citations omitted). See also *Southern Industrial Banking Corp. v. Delta Properties, Inc.* 542 S.W.2d 815, 819 (Tenn. 1976), wherein the Supreme Court reiterated the owner-vendor application of the party to be charged rule in real property cases and observed that the purpose of the statute of frauds is "to avoid the inevitable duel of different versions of the spoken word, unsettling and legally intolerable where real property is involved." The holding of the chancellor that the memoranda in evidence is insufficient in law to satisfy the statute of frauds is affirmed.


## IV.


Appellant next asserts that Capitol Records is equitably estopped from asserting the statute of frauds as a defense. Mason asserts that, in reliance upon the oral representations of Capitol, he expended time, effort and money in seeking out and negotiating with potential tenants for the building, and that Capitol Records held him out to the public as the new owner of the building. The Supreme Court of Tennessee has held as follows:

> The appellate courts of this state consistently have refused to enforce an oral contract for the sale of land on the basis of part performance alone. And, it is now a rule of property in this state that part performance of a parol contract for the sale of land will not take the agreement out of the statute of frauds. The harshness of this rule has been mitigated by the application of the doctrine of equitable estoppel in exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud.
>
>> "Equitable estoppel, in the modern sense, arises from the 'conduct' of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do any thing. Its foundation is justice and good conscience. Its object is to prevent the unconscientious and inequitable assertion or enforcement of claims or rights which might have

> existed, or been enforceable by other rules of law, unless prevented by an estoppel; and its practical effect is, from motives of equity and fair dealing, to create and vest opposing rights in the party who obtains the benefit of the estoppel."

*Baliles v. Cities Serv. Co.*, 578 S.W.2d 621, 624 (Tenn. 1979) (citations omitted).

The difficulty with the position of Mason in this respect is that he knew from the beginning that Capitol Records would not sell the building to him with any obligation upon Capitol to lease the building. He therefore dropped this provision from his January 16, 1998 original proposal and accepted the responsibility for leasing the building himself. These expenditures of time, effort and money were made at a time when Mason knew that he had no binding agreement with Capitol, and that even under his proposal Capitol had no obligation to secure tenants for the building. He cannot be faulted for his actions in seeking prospective tenants because if the parties agreed on a sale, he obviously would not want part or all of the building to be vacant after his purchase. Such does not implicate Capitol in any inequitable conduct.

The conduct of Capitol simply does not rise to a level "verging on actual fraud" as in *Baliles v. Cities Service* or as in *GRW Enterprises, Inc. v. Davis*, 797 S.W.2d 606 (Tenn. App. 1990). The case is more akin to *Gorbics v. Close*, 722 S.W.2d 672 (Tenn. App. 1986), wherein the court declined to hold an estoppel to rely upon the statute of frauds. In *Gorbics*, without an adequate writing, the plaintiff Gorbics moved his trailer home upon an acre of land and installed a fence and sewage system in reliance on an alleged agreement. This court held that in the absence of proof that Gorbics could not move the trailer from the property or that the trailer somehow benefitted Close, there was no basis for an estoppel. Like the *Gorbics* court, we conclude that the compelling circumstances necessary to effect equitable estoppel are simply not present in this case.

V.

Finally, Mason asserts in his brief that "Capitol's motion only addressed Mr. Mason's contract claim. The trial court, nonetheless, granted summary judgment on issues never briefed or argued, including fraud and the Consumer Protection Act. This was error." The opening paragraph of defendant's motion for summary judgment, filed April 3, 1998, asserts that "Defendant respectfully moves, pursuant to Rule 56 of the Tennessee Rules of Civil Procedure, that this court enter a summary judgment dismissing all of plaintiff's claims and causes of action against defendant herein, with prejudice, on the grounds that there is no genuine issue of material fact and that defendant is entitled to summary judgment of dismissal as a matter of law."

Thereafter and alternatively, the defendant asserted a motion for partial summary judgment dismissing all of plaintiff's claims for equitable relief. Defendant further requested that this alternative summary judgment be entered as a final judgment pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure.

In its final order entered June 5, 1998 the trial court made the following finding:

> I.   Defendant's motion for summary judgment is granted in its entirety. All of plaintiff's claims and causes of action herein against defendant are hereby dismissed with prejudice pursuant to Rule 56 of the Tennessee Rules of Civil Procedure.

Following this finding in the order, for some reason not apparent from the record, the chancellor expressly determined no just reason for delay and entry of final judgment, pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure.

So it is that we have a motion for summary judgment as to all issues followed by an alternative motion for summary judgment as to all equitable claims. We have a final order sustaining the motion for summary judgment in its entirety on all issues followed by a Rule 54.02 provision, consistent with the grant of summary judgment as to less than all issues, but unnecessary to a grant of summary judgment as to all issues. A grant of summary judgment under Rule 56 as to all issues is a final judgment. *Allstate Ins. Co. v. Hartford Accident & Indemnity Co.*, 483 S.W.2d 719

(Tenn. 1972). Such a judgment is appealable as a matter of right. When summary judgment is granted on less than all issues between a party plaintiff and a party defendant, it becomes a final judgment as to such summary disposition of issues upon the direction of the trial court, based upon an expressed determination that there is no just reason for delay in an appeal.

In this case, it appears that neither party argued before the trial judge the issues of fraud and the application of the Consumer Protection Act. The above quotation from the brief of the appellant is the only statement made before this court relative to these issues. Since the motion for summary judgment by Capitol Records did in fact address all of the issues of the case and was, in fact, granted by the trial court on all issues and appellant cites no authority in support of its position, such issues are waived on appeal. *State v. Dickerson*, 885 S.W.2d 90 (Tenn. Crim. App. 1993); Tenn. R. App. P. 27(a)(7). Regardless of waiver, it is difficult to see how the Tennessee Consumer Protection Act could apply in this case, *see Ganzevoort v. Russell*, 949 S.W.2d 293 (Tenn. 1997), and it is equally difficult to see how plaintiff could prevail on a fraud claim in view of our finding on the equitable estoppel assertion. Under the circumstances of this case, Tennessee Rules of Appellate Procedure Rule 36 will be applied to the end that these issues will be determined because they are first of all included in the general motion for summary judgment, and secondly, no purpose would be served in remanding this case on issues effectively determined by our action herein.

## VI.

The judgment of the trial court granting to the defendant Capitol Records summary judgment on all issues is in all respects affirmed. The parties never agreed on the essential terms of the sale of the Capitol Building and thus never formed an enforceable contract. Even if they had, the combination of letters and documents in the record would be insufficient to satisfy the statute of frauds and, furthermore, Capitol Records did not engage in conduct which would equitably estopp it from

relying on the statute. Finally, we find that all of Mason's issues were properly disposed of by the trial court's grant of summary judgment. Costs are assessed against the plaintiff/ appellant, John Mason.


_____
WILLIAM B. CAIN, JUDGE


CONCUR:


_____
WILLIAM C. KOCH, JR., JUDGE


_____
PATRICIA J. COTTRELL, JUDGE